1  PAUL M. BRENT ESQ. - SBN 125976             (SPACE BELOW FOR FILING STAMP ONLY)
   STEINBERG, NUTTER & BRENT
2  LAW CORPORATION
   23801 CALABASAS ROAD, SUITE 2031
3  CALABASAS, CALIFORNIA 91302
   TELEPHONE (818) 876-8535; (310) 451-9714
4  FACSIMILE (818) 876-8536; (310) 451-0929

5
   *Attorneys For*: Debtor and Debtor-In-Possession, Colonial Yacht Anchorage, Inc.
6
                    UNITED STATES BANKRUPTCY COURT
7
                    CENTRAL DISTRICT OF CALIFORNIA
8
                         LOS ANGELES DIVISION
9

10 In re                              ) Case No. 2:11-bk-46267-RN
                                      ) Chapter 11
11                                    )
   Colonial Yacht Anchorage, Inc.     ) Adv. No.
12                                    )
              Debtor and             ) **COMPLAINT:**
13            Debtor-In-Possession.  ) **(1) FOR DECLARATORY RELIEF AGAINST**
                                      ) **DEFENDANT;**
14 _____    ) **(2) BREACH OF CONTRACT**
                                      )
15 Colonial Yacht Anchorage, Inc.     )
                                      )
16            Plaintiff,             )        NO HEARING SET
                                      )
17 vs.                                ) Date:
                                      ) Time:
18 City of Los Angeles                ) Place:   Courtroom "1645"
                                      )          255 E. Temple Street, 16th Floor
19            Defendants.            )          Los Angeles, California 90012
20 _____

21     Chapter 11 Debtor and Debtor-In-Possession Colonial Yacht Anchorage, Inc.(hereinafter

22 "Debtor")) hereby files this Complaint: (1) For Declaratory Relief Against Defendant to determine

   the parties rights and liabilities, and (2) for Breach of Contract, and based, in part,  upon information
23
   and belief, respectfully alleges as follows:
24
              **STATEMENT OF JURISDICTION, VENUE AND STANDING**
25
       1.    Debtor initiated its Chapter 11 proceeding on August 25, 2011 and is and remains a
26
   Chapter 11 Debtor-In-Possession.
27
   \\\
28

                                           1
              COMPLAINT FOR DECLARATORY RELIEF AND BREACH OF CONTRACT

1   2.    The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28

2   U.S.C. §§ 157(b)(2)(A), (M),(O) and 1334, and FRCP 7001(1),(2) and (9). This adversary proceeding

3   is "core" in nature.

4   3.    Venue properly lies in this judicial district in that this adversary proceeding arises under

5   Title 11 of the United States Code as provided for in 28 U.S.C. § 1409.

6   4.    This adversary proceeding arises out of and is related to the bankruptcy case of Debtor,

7   In re: Colonial Yacht Anchorage, Inc., Case No.2:11-bk-46267-RN, pending in the United States

8   Bankruptcy Court for the Central District of California, Los Angeles Division.

9   5.    The Debtor as a Debtor-In-Possession has standing to bring this action to maximize its

10  Estate.

11  **PARTIES TO THE ACTION**

12  6.    The Debtor and Debtor-In-Possession is the Plaintiff in this adversary action herein,

13  having initiated its Chapter 11 proceeding on August 25, 2011.

14  7.    Debtor is informed and believes and on that basis alleges that Defendant City of Los

15  Angeles, is an entity of an unknown type that effectively operates within this judicial district and is

16  subject to the venue and jurisdiction of this Honorable Court.

17  **CHARGING ALLEGATIONS**

18  8. On or about 2002, Colonial Yacht Anchorage, Inc. entered into Permit No. 800

19  ("Permit") with the City of Los Angeles ("City") for approximately 189,116 square feet of land in

20  the Port of Los Angeles, Berth 204 ("Premises"). A true and correct copy of the Permit is attached

21  hereto as Exhibit "A".

22  9. Section 8(a)(6) of the Permit entitled "City's Maintenance Obligations" requires the "City

23  at City's expense to maintain and repair all revetments and retaining slopes, breakwaters, and other

24  improvements owned by City located on or adjacent to the Premises…"

25  10. As early as 2006 and continuing thereafter, the then principal of the Debtor,  Agostino

26  Camello, who operated the Debtor for decades, began complaining to the City that the pre-petition

27  Debtor could not efficiently conduct its business if the City did  not honor its obligation to repair

28  the revetment (the shoreline portion of the property which prevents the sea from entering onto the

2
**COMPLAINT FOR DECLARATORY RELIEF AND BREACH OF CONTRACT**

1  Debtor's land which is used pursuant to the Permit) as required under Section 8(a)(6) of the Permit.

2      11. In response thereto, on or about  June 3, 2006, in correspondence  from the Executive

3  Director of the Port of Los Angeles directed to A. Camello, the City wrote  the pre-petition Debtor

4  asserting, among other things, that the repairs would be made and that the work was to be

5  provided pursuant to Section 8 and that the Defendant and/or entities under its control were

6  required to repair the revetment and  would be undertaking those repairs.

7      12. The City subsequently hired Noble Consultants, Inc., a civil engineering firm

8  specializing in harbor and marina resources engineering, to study the issue of repairs to the

9  revetment.  The pre-petition Debtor later discovered by speaking with Noble Consultants, Inc. that

10  the City was considering plans that would  either stabilize the revetment shoreline in order to honor

11  their agreement  or instead had a plan to eliminate the Debtor . Plaintiff is informed and believes

12  and thereon alleges that there exists a Noble Consultant's summary analysis, regarding damage to

13  the revetment at the Port of Los Angeles and which provides two alternatives for solving the issue:

14  (1) Shoreline Realignment Plan without Tenants and (2) Slope Redress and Stabilization Plan with

15  Tenants.

16      13. In the meantime, during the period of 2006-2009, the City continued to advise the pre-

17  petition Debtor that it would make the necessary repairs to the Debtor premises. Despite those

18  representations those repairs were never made.

19      14. In 2009, a number of storms occurred which caused the docks from which the Debtor

20  operates to separate from the revetment.  This occurred due to the fact that the revetment was in

21  such poor condition and in such great need of repair.

22      15. Immediately following the storms, the Debtor continually and reasonably  continued to

23  request the City to make the necessary repairs and the Debtor was continually promised that the

24  repairs would be made.

25      16. Ultimately, because the City failed to timely make the required repairs, in order to continue

26  to operate its business the Debtor was  forced to expend nearly $40,000.00 to stabilize the land

27  connecting its docks to the damaged revetment.  These repairs were undertaken with the

28  understanding that both the repairs to the revetment would be made as had been represented and  in

3

**COMPLAINT FOR DECLARATORY RELIEF AND BREACH OF CONTRACT**

1    reliance that the Debtor would be compensated for its losses and cost of repair.

2        17.    In 2010, the Debtor was advised by the City that it wanted to commence the

3    repairs required by the Permit in order to allow the Debtor to occupy and successfully run its

4    business.

5        18.    At that time, for the first time, the City also advised that it desired to "reform" the

6    Permit and to take back a portion of the land the Debtor utilizes.  Plaintiff is informed and believes

7    and thereon alleges that there exist minutes of the Port of Los Angeles Community Advisory

8    Committee, dated February 9, 2010 and January 13, 2011, respectively, stating in Item E on

9    February 9, 2010 that "construction is expected to commence [on the Wilmington Youth Sailing

10   Center] by mid 2011 with completion by mid 2012" and later in Item F.1.c. on January 13, 2011

11   that the Youth Sailing Center will be "located on an existing site **owned** by Colonial Yacht."

12   (emphasis added).

13       19. Suddenly, in January 2011, the City commenced an action to evict the Debtor, ostensibly

14   on the grounds of non-payment of rent ("UD 1").  In the answer to UD 1 the Debtor objected to the

15   eviction, *inter alia,*  on the grounds that the City had not made the prior repairs as requested,

16   required and promised.  The City then failed to continue with UD 1.

17       20. On May 31, 2011, the City filed a second eviction action against the Debtor in retaliation

18   for its request for repairs and to permanently eject the Debtor from Berth 204 in order to install,

19   inter alia, the aforementioned "Youth Sailing Center"  ( "UD 2").

20       21. On or about June 20, 2011, the City revealed its motive for wrongfully commencing the

21   eviction actions by sending the Debtor, in writing, notice that they intended the Debtor's premises

22   to be occupied for a Youth Sailing Center.

23       22. To date the City still has not repaired the revetment, despite its obligations and promises to

24   do so, and the Debtor has been and continues to be damaged by the City's actions.

25                              **FIRST CLAIM**

26                   **(DECLARATORY RELIEF AS AGAINST ALL DEFENDANTS)**

27       23.  Plaintiff incorporates by reference, each and every allegation set forth above as if the

28   same was set forth verbatim at this point.

4

COMPLAINT FOR DECLARATORY RELIEF AND BREACH OF CONTRACT

24. Based upon the above, an actual, concrete and justiciable controversy has arisen between and among the Debtor, on the one hand, and Defendant, on the other hand. This controversy includes the nature of the agreement (the Permit) between the parties and the obligations arising thereunder and requires adjudication so that Debtor may proceed to successfully implement a reorganization plan, and otherwise proceed within its Chapter 11 proceeding. Bankruptcy Court resolution of the adversary herein shall also minimize attorneys fees and costs for all concerned, and shall streamline the claims process within Debtor's Chapter 11 proceeding.

25.    Based upon the above, the Debtor requests adjudication by declaratory relief of the nature of the Permit and agreement between the parties as well as the type and obligations of and between the parties as well as any and all liability between Debtor, on the one hand, and Defendant, on the other.

### SECOND CLAIM

### (BREACH OF CONTRACT AS TO ALL  DEFENDANTS)

26. The Debtor realleges each and every allegation set forth in paragraphs 1 through 25, above, and incorporates the same herein by reference as though fully set forth at this point.

27.  The Debtor is informed and believes, and on that basis alleges, that City has breached and continues to breach the terms of the Permit, including, specifically, Section 8 as set forth in the attached Exhibit "A".

28. As a result of said breach the Debtor alleges that it has been damaged in an amount to be proven at time of trial but in no event to be in an amount less that $ 40,000.00.

WHEREFORE, Debtor prays that this Honorable Court enter  judgment against Defendant as follows:

### ON THE FIRST CLAIM FOR RELIEF

1.    For a judgment declaring the rights, duties and obligations of the parties under the Permit as well as the nature of the Permit itself ;

### ON THE SECOND CLAIM FOR RELIEF

1.    Separately and distinctly from any relief afforded by this Court with respect to the

5

**COMPLAINT FOR DECLARATORY RELIEF AND BREACH OF CONTRACT**

1  imposition the declaration of rights, the entry of an order by this Court determining that the Debtor

2  is entitled to an award of damages for breach of the Permit by Defendant in an amount to be

3  determined at trial but in no event to be less than the sum of $40,000.00 and awarding a judgment

4  in said amount, together with interest thereon at the legal rate;

5                              **ON ALL CLAIMS FOR RELIEF**

6  1.     For reasonable attorney fees and disbursements incurred in pursuing the above claims, and,

7  2.     For such other and further relief as this Honorable Court may, in its discretion, deem just,

8  proper and appropriate.

9

10  DATED: September _____, 2011                STEINBERG, NUTTER & BRENT
                                                   LAW CORPORATION
11

12                                                     /s/ Paul M. Brent
13                                                 By: PAUL M. BRENT,
                                                   Attorney for Debtor and Debtor-In-
14                                                 Possession/Plaintiff, Colonial Yacht
                                                   Anchorage, Inc.
15  [E:\CLIENTS\C\Colonial Yacht\City Complaint.wpd]

16

17

18

19

20

21

22

23

24

25

26

27

28

                                           6
_____
                COMPLAINT FOR DECLARATORY RELIEF AND BREACH OF CONTRACT



PERMIT NO. 800

GRANTED BY THE CITY OF LOS ANGELES

TO COLONIAL YACHT ANCHORAGE, INC.

## TABLE OF CONTENTS

<u>Page</u>

Section 1.    Terms Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Section 2.    Premises Granted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    (a)    Description . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
    (b)    Reservations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

        (1)    Utility Rights-of-Way . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
        (2)    Streets and Highways . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
        (3)    Prior Exceptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
        (4)    Oil Drilling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    (c)    Inspection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

        (1)    Suitability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
        (2)    Additions and Improvements at Tenant's Expense . . . . . . . . . .  4

    (d)    Modification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
    (e)    Access to Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
    (f)    Special Conditions Related to Dredging and Construction of the
Alameda Corridor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Section 3.    Term and Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    (a)    Length . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
    (b)    Extensions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Section 4.    Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

    (a)    Fixed Minimum Rent and Rent Deposit . . . . . . . . . . . . . . . . . . . . .  5
    (b)    Percentage Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
    (c)    Gross Receipts Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
    (d)    Business Curtailment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
    (e)    Delinquent Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
    (f)    Records and Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
    (g)    Promotion of Los Angeles Harbor Facilities . . . . . . . . . . . . . . . .  11
    (h)    Supervision of Business Practices . . . . . . . . . . . . . . . . . . . . . . .  11
    (i)    Schedule of Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
    (j)    Disputed Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
    (k)    Services and Utilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
    (l)    Renegotiation of Compensation . . . . . . . . . . . . . . . . . . . . . . . . .  12

Section 5.    Uses ............................................... 13

    (a)    Permitted Uses ........................................ 13
    (b)    Increased Insurance Rates ................................ 14
    (c)    State Tidelands Grants .................................. 15
    (d)    Signs ............................................... 15
    (e)    Vessel Relocation ..................................... 15

Section 6.    Default and Termination ................................ 15

    (a)    Default .............................................. 15
    (b)    Thirty (30) Day Nonuse................................. 16
    (c)    Termination by Court Decree ............................ 16
    (d)    Termination by Destruction of Premises .................... 16
    (e)    Bankruptcy, Credit Arrangements, Attachments, Tax Liens ......... 17

Section 7.    Improvements ....................................... 17

    (a)    Plan Approvals ....................................... 17

        (1)    Mandatory Tenant Submitted Development Plan ............ 18
        (2)    Type I and Type II Improvements ...................... 18
        (3)    Force Majeure ...................................... 20
        (4)    Variance .......................................... 20
        (5)    State Department of Boating & Waterways Requirements ..... 20
        (6)    Surety Bond for Completion of Development Plan
            Repair, Refurbishment, and/or Replacement Construction .... 20
        (7)    Mid-term Independent Inspection of Land and Water
            Improvements ...................................... 21

    (b)    Cost of Permits and Construction ......................... 21
    (c)    Notices ............................................. 21
    (d)    Ownership .......................................... 21
    (e)    City Improvements .................................... 21

Section 8.    Maintenance and Restoration ............................ 21

    (a)    Maintenance ......................................... 21

        (1)    Maintenance Performed by Tenant at Its Expense .......... 21
        (2)    Tenant's Responsibility for Damage ...................... 22
        (3)    City's Option to Perform Work at Tenant's Expense ......... 22
        (4)    Inspection of Premises and Tenant Repairs ................ 22
        (5)    City's Actual Costs ................................... 22

| | | |
|---|---|---|
| (6) | City's Maintenance Obligations . . . . . . . . . . . . . . . . . . . . . . . | 23 |
| (b) | Restoration and Surrender of Premises . . . . . . . . . . . . . . . . . . . . . . . | 23 |
| (1) | Restoration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
| (2) | Charges After Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
| (3) | Surety Bond for Hazardous Material Cleanup . . . . . . . . . . . . . | 23 |
| (c) | Hazardous Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
| (1) | Hazardous Materials on the Premises . . . . . . . . . . . . . . . . . . | 23 |
| (2) | Site Testing and Characterization . . . . . . . . . . . . . . . . . . . . . | 24 |
| (3) | Site Remediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |
| (d) | Environmental Compliance Audit, Site Characterization, and Site Remediation Work Plan . . . . . . . . . . . . . . . | 25 |
| (1) | Acknowledgment of Boat Repair Operations . . . . . . . . . . . . . . | 25 |
| (2) | Site Audit, Preliminary Site Assessment and Testing Work Plan Provided by City . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25 |
| (3) | Site Characterization and Remediation Work Plan Provided by Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 26 |
| (4) | Non-compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
| (e) | Inspection of Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
| (f) | Contamination Not Caused by Tenant . . . . . . . . . . . . . . . . . . . . . . . | 27 |
| Section 9. | Indemnity and Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
| (a) | Indemnity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
| (b) | Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 |
| (1) | Public Liability and Property Damage . . . . . . . . . . . . . . . . . . | 29 |
| (2) | Fire Legal Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29 |
| (3) | Fire and Extended Coverage Insurance . . . . . . . . . . . . . . . . . | 29 |
| (4) | Notice of Cancellation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| (5) | Copies of Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| (6) | Renewal of Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| (7) | Modification of Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| (c) | Accident Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| (d) | Language to be Inserted in Marina Berthing Agreements . . . . . . . . . | 30 |

iii

(Revised 6/11/02)

Section 10.    Assignment and Sublease ................................. 31

    (a)    Assignments/Subleases Restricted ........................... 31
    (b)    Right to Terminate ........................................ 32
    (c)    Change of Ownership in Tenant; Affiliates ................... 32
    (d)    Assignments for Security Purposes ......................... 33
    (e)    Subleases ............................................... 34
    (f)    Miscellaneous Conditions ................................. 35

Section 11.    Miscellaneous ....................................... 35

    (a)    Statements of Tenant ..................................... 35
    (b)    Applicable Law .......................................... 35
    (c)    Compliance with Laws .................................... 35
    (d)    Non-discrimination ....................................... 35
    (e)    Minority Business Enterprise/Women Business Enterprise .......... 35
    (f)    License Fees and Taxes ................................... 36
    (g)    Invalidity ............................................... 36
    (h)    Attorney's Fees .......................................... 36
    (i)    Conflict of Interest ....................................... 36
    (j)    Visitors ................................................. 36
    (k)    Notices ................................................. 36
    (l)    Waivers ................................................. 37
    (m)    Integration .............................................. 37
    (n)    Time of the Essence ...................................... 37
    (o)    Extensions .............................................. 37
    (p)    Authority ............................................... 37
    (q)    Quiet Possession ........................................ 37
    (r)    Prior Permits ............................................ 38
    (s)    Standard for Discretionary City Actions Not Related to
        Assignments, Subleases, or Changes in Use of Premises .......... 38
    (t)    Service Contract Worker Retention ("SCWR") and Living Wage
        Policy .................................................. 38
    (u)    Business Tax Registration Certificate .......................... 39

## EXHIBIT LISTING

EXHIBIT A.   Premises Drawing

EXHIBIT B.   Standard of Operations
1.   Listing of Liveaboards
2.   Marine Regulations
3.   Marina Janitorial Standards
4.   Marina Maintenance Standards

EXHIBIT C.   Design Criteria
1.   East Basin/Cerritos Channel Marinas General Lease Development and Design Criteria Applicable to All Marinas

2.   Type I Improvements - Minimum Requirements and Specifications for Rehabilitation/Replacement of Improvements in East Basin/Cerritos Channel Marinas

3.   Type II Improvements - Layout and Design Guidelines for Small Craft Berthing Facilities Produced by the California State Department of Boating and Waterways

EXHIBIT D.   Floating Structures

EXHIBIT E.   Affirmative Action

EXHIBIT F.   Minority Business Enterprise/Women Business Enterprise

EXHIBIT G.   Living Wage Ordinance Declaration of Compliance

v

PERMIT NO. 800
GRANTED BY THE CITY OF LOS ANGELES
TO COLONIAL YACHT ANCHORAGE, INC.

THIS PERMIT (hereinafter called "Agreement") is made and entered into this
_____ day of _____, 20____, by and between THE CITY OF LOS ANGELES,
a municipal corporation (hereinafter called "City") acting by and through its Board of Harbor
Commissioners (hereinafter called "Board"), and COLONIAL YACHT ANCHORAGE, INC.,
a California corporation, Berth 204, Wilmington, California  90744 (hereinafter called
"Tenant").

Section 1.    Terms Defined.  For the purposes of this Agreement, the following
words shall have the meanings below:

"Agreement" - this written contract between City and the Tenant, including
the exhibits.

"Berthing" - includes all vessel slips, moorings, side-ties, end-ties,
anchorages and any other location or facility for in-water storage of vessels.

"Board" - the Board of Harbor Commissioners.

"City" - the City of Los Angeles.

"Default" - the failure of Tenant to comply with a term of this Agreement
within the applicable time period set forth in Section 6 of this Agreement.

"Hazardous Material" - any material (solid, liquid, or gaseous) classified as
hazardous or toxic under any Law regardless of whether such material is cargo on
the Premises, a material used in operation of the Premises, a by-product of
operations on the Premises, or any such material otherwise on the Premises.

"Improvement(s)" - includes, but is not limited to, buildings, grading, paving,
pipelines, physical alterations of the Premises, structures and utilities, regardless
of whether above, on, or underground.

"Improvement Completion Date" - on or before July 6, 2006. *A. C.*

"Law" - any statute, ordinance, regulation, rule or other enactment of a
federal, state, county, City, regional, local or other governmental entity or a judicial
ruling which applies to the parties to this Agreement.

1        (Revised 6/11/02)

"Liveaboard" - registered owner of a boat listed on the Exhibit "B" listing of liveaboards and immediate family members also listed who are living on the boat. Immediate family members means the spouse of the registered owner and the children of the registered owner or spouse. At no time may the number of liveaboards aboard any one vessel exceed four (4) persons unless Tenant consents in writing to a greater number, not to exceed six (6).

"Maintain" - to keep the Premises (other than those portions of the Premises which the City is obligated to maintain under this Agreement), all Tenant Improvements and all of Tenant's machinery and equipment on the Premises in a condition at least equal to that of the better class of similar businesses providing similar services in the City or adjacent communities, a safe condition, and in compliance with all applicable Laws, this Agreement, and all Harbor Engineer permit conditions and at Tenant's expense.

"Premises" - the areas granted by this Agreement described in Section 2(a) hereof.

"Restore" - to return the Premises (other than those portions of the Premises which City is obligated to maintain under this Agreement) to the condition in which they were received from City and to remove all Tenant Improvements unless City agrees in writing to accept any Tenant Improvements with all restoration costs paid by Tenant.

"Review Board" - a Port-designated Review Board comprised of Property Management and Engineering personnel (see Subsection B.1 of Section 1 of Exhibit "C") to review Tenant's Development Plan for the Section 7 improvements.

"Tenant Improvements" - the improvements placed on the Premises by Tenant or Tenant's predecessor under any previous Agreement and any improvements constructed by Tenant on the Premises following the commencement of the term of this Agreement.

"Term" - any provision of this Agreement whether a condition, covenant, reservation or other provision.

"Utilities" - any service, public or private, which now or later may be provided to the Premises, including, but not limited to, light, power, water, gas, oil, microwave, magnetic wave, sewer, solar, telephone, or ferry.

Section 2.    Premises Granted.

(a)    Description. The Premises are Parcel Nos. 1-9 consisting of approximately 222,042 square feet (s.f.) of water space and 189,116 s.f. of land space on preliminary

2

Drawing No. 1-1423-1, copy attached as Exhibit "A", and include all Improvements owned by or under the control of Board within such parcels. A final version of the drawing to be prepared by and on file with the Office of the Chief Harbor Engineer will be substituted for the preliminary drawing when available. Improvements owned by the City when this Agreement is entered into only include the revetment and retaining structures and slopes on the Premises. Other than such revetments and retaining structures and slopes, no other City structures or improvements shall be considered a part of the Premises unless this Agreement is amended to add such improvements. City hereby grants the use and possession of the Premises to Tenant on the Terms set forth in this Agreement.

(b)    Reservations. The Premises are subject to:

(1)    Utility Rights-of-Way. Rights-of-way for such Utilities as Board reasonably determines to be necessary from time to time, including the right to enter the Premises to construct and maintain them, without compensation or abatement of rent, provided the surface shall be restored to the condition previously existing, if feasible. If future utility right-of-way Improvements as described above significantly interfere with Tenant's use of the Premises, the compensation set by Section 4 of this Agreement shall be adjusted by considering the negative impact of such Improvements on Tenant's operation.

(2)    Streets and Highways. Rights-of-way for streets, highways, railroads, and other means of transportation which are apparent from a visual inspection or which have been established or which are reserved in this Agreement.

(3)    Prior Exceptions. All prior exceptions, reservations, grants, easements, leases or licenses of any kind whatsoever in the Official Records of the County Recorder of Los Angeles County or other governmental agency or in the records of City or any of its various departments.

(4)    Oil Drilling. The right of City to use and grant others the right to produce oil or other hydrocarbon substances therefrom; provided that such uses do not materially interfere with the Tenant's permitted operations and provided Tenant shall have no liability in connection with hydrocarbon production on the Premises; and provided further that such right shall not include the right of surface entry on the Premises.

(c)    Inspection. Tenant has inspected the Premises and agrees that:

(1)    Suitability. The Premises are suitable for Tenant's intended uses. No representation or warranty with respect to the Premises shall be binding on City unless it is in writing attached to this Agreement.

3

(2)    Additions and Improvements at Tenant's Expense.  Any change to the Premises (other than those portions of the Premises which City is obligated to maintain under this Agreement), construction of Tenant Improvements, and any equipment installation required pursuant to applicable Law in connection with Tenant's operations by any local, regional, state or federal agency shall be constructed or installed at Tenant's sole expense.

(d)    Modification.  In the event that this Agreement requires the approval of the Council of City to become effective, then, by mutual agreement, land and water not exceeding twenty thousand (20,000) square feet in the aggregate may be added to or deleted from the premises granted herein without further approval of the Council of City. The amount of rent payable pursuant to Section 4 shall be increased or decreased on a pro rata basis to reflect any such addition or deletion. The General Manager of the Harbor Department of City (hereinafter called "Executive Director") is authorized to execute amendments to this Agreement to effect the foregoing adjustments to area and compensation without further action of the Board of Harbor Commissioners and, in the event this Agreement does not require approval of the Council of City, to execute other amendments to the Agreement which are in the interest of the Harbor Department and the City of Los Angeles; provided, however, that the authority of Executive Director to execute amendments without Board approval is restricted to amendments which will not result in a change in annual compensation which exceeds the sum of Fifty Thousand Dollars ($50,000).

(e)    Access to Premises.  City shall provide to Tenant such necessary and appropriate rights of ingress and egress for vehicular and pedestrian traffic via existing streets, roadways and sidewalks across the property of City adjacent to the Premises as reasonably required for the operation of the Premises.

(f)    Special Conditions Related to Dredging and Construction of the Alameda Corridor.  City makes no representation as to the present or future depth or condition of the water areas of Tenant's premises or adjacent premises.  In addition, Tenant is aware that the construction of the Alameda Corridor Project (which may occur now or in the future) may affect Tenant's premises or the access to Tenant's premises.  Tenant specifically agrees that it accepts the premises subject to such burdens and does not expect any adjustment in rent or payment of any other monies associated with any inconvenience or inefficiencies in its use of the premises from City which may result from construction of the Alameda Corridor or City-related projects.  This paragraph is not intended to affect the legal rights which the Alameda Corridor Transportation Authority ("ACTA") and Tenant may have as to each other under applicable law related to ACTA project improvements.

Section 3.    Term and Effective Date.

(a)    Length.  The term of this Agreement shall be thirty (30) years beginning on November 1, 1995 and ending October 31, 2025.  However, Tenant shall have the option

4

to terminate this Agreement sooner upon at least one hundred eighty (180) days' prior
written notice given at any time prior to November 1, 2001 and effective upon the date set
forth in such notice, but not later than April 29, 2002. On or before July 6, 2006, Tenant
shall have completed all improvements identified in the Tenant Development Plan required
under Section 7 of the Agreement to the satisfaction of the City, or City, acting through its
Executive Director, has the unconditional right to terminate the Agreement by providing
thirty (30) days' notice of default to Tenant.

    (b)   <u>Extensions.</u> Tenant may not stay on nor retain any part of the Premises after
this Agreement terminates or expires without Executive Director's prior written approval.
Any approval shall be deemed an extension on a month-to-month basis upon the same
Terms in this Agreement, except that the rent shall increase. The minimum and
percentage rent during the extension shall be one hundred twenty-five percent (125%) of
the rent in effect at the expiration or termination, unless Executive Director, upon written
notice to Tenant, increases the rent by some other percentage. If a new agreement is
reached during the extension, the monies paid during the extension shall count against the
new rent which shall accrue from the date the extension commenced. If the new rent is
more than the rent paid during the extension, Tenant shall immediately pay City the
difference due. If the new rent is less, Tenant shall receive a credit against future sums
to be paid to City. No interest shall accrue on the amount due to City or Tenant pursuant
to this provision except to the extent Tenant fails to pay any deficiency within thirty (30)
days of a billing from City. If interest is due, it shall accrue at the rate provided in
Section 4(e).

Section 4.   <u>Compensation.</u>

    (a)   <u>Fixed Minimum Rent and Rent Deposit.</u> This Agreement is being entered into
for premises which Tenant has occupied on a holdover basis since 1995 pursuant to the
terms of Tenant's last agreement with City and for which Tenant has continued to pay City
rent at the rate last specified in the last agreement. Once this Agreement becomes
effective, the fixed minimum monthly rent due for the thirty (30) year term of this
Agreement shall be as set forth below. Within ninety (90) calendar days of this Agreement
becoming effective, which is the date the Agreement is signed by the Executive Director
after action by the City Council in the manner required by Charter Section 606, City's
Accounting Division shall compare the amount of rent which Tenant has paid and is
payable to City for the periods (1) November 1, 1995 through January 26, 1999, and
(2) January 27, 1999 to the effective date of the Agreement. If Tenant owes City money,
Tenant shall pay City such money within thirty (30) calendar days of a billing from City. If
City owes Tenant money, Tenant shall be notified in writing of the amount of money owed
to Tenant by City at the end of the 90-day period following the effective date fo the
Agreement. City shall place the money owed Tenant in an interest bearing account, and
the principal and interest accrued thereon shall be provided as a credit against monies
Tenant owes City for future rent within 30 days of written notification from Executive
Director that all improvements identified in the Tenant Development Plan required under
Section 7 have been completed (text continued on page 6)

5

(Revised 3/12/02)

on or before July 6, 2006, to the satisfaction of City.

(1)    For the period November 1, 1995 through January 26, 1999, minimum rent shall be Sixteen Thousand Eleven Dollars ($16,011) per month.  The rent is based on a 10% annual return on property value at a rental rate of $1.17 per square foot per year for land and $.293 per square foot per year for water, with each rate then discounted by 25% as consideration for Tenant's payment to City of percentage rent as described in Section 4(b) of this Agreement and an additional 25% of the original land rate for Parcel Nos. 4, 5 and 6 reflecting Tenant's participation in the environmental compliance program described in Section 8(d) of the Agreement.  In the event Tenant fails to timely satisfy the requirements of Section 8(d), minimum monthly rent shall be increased to Seventeen Thousand Six Hundred Sixty-one Dollars ($17,661) due to loss of the discount.  The increased rate shall take effect ninety-five (95) days after City, acting through its Executive Director, has mailed notice to Tenant listing Section 8(d) requirements which Tenant has failed to meet, provided that if Tenant corrects all deficiencies to the satisfaction of Executive Director within the 95-day period, then the rate increase shall not take effect.  No charge shall be required for the approximately 3,212 s.f. area shown crosshatched on Parcel No. 2 of Exhibit "A" due to limited utility of the land. However, Tenant shall have maintenance, liability, indemnity, insuring and all other obligations as set forth in this Agreement for its use of the parcel.

(2)    For the period January 27, 1999 to the effective date of the Agreement, minimum rent shall be Nineteen Thousand One Hundred Seventy-seven Dollars ($19,177) per month.  The rent is based on a 12% annual return on property value at a rental rate of $1.40 per square foot per year for land and $.352 per square foot per year for water, with each rate then discounted by 25% as consideration for Tenant's payment to City of percentage rent as described in Section 4(b) of this Agreement and an additional 25% of the original land rate for Parcel Nos. 4, 5 and 6 reflecting Tenant's participation in the environmental compliance program described in Section 8(d) of the Agreement.  In the event Tenant fails to timely satisfy the requirements of Section 8(d), minimum monthly rent shall be increased to Twenty-one Thousand One Hundred Fifty-one Dollars ($21,151) due to loss of the discount.  The increased rate shall take effect ninety-five (95) days after City, acting through its Executive Director, has mailed notice to Tenant listing Section 8(d) requirements which Tenant has failed to meet, provided that if Tenant corrects all deficiencies to the satisfaction of Executive Director within the 95-day period, then the rate increase shall not take effect.  No charge shall be required for the approximately 3,212 s.f. area shown crosshatched on Parcel No. 2 of Exhibit "A" due to limited utility of the land.  However, Tenant shall have maintenance, liability, indemnity, insuring and all other obligations as set forth in this Agreement for its use of the parcel.

(Revised 6/11/02)

(3)    Beginning on the effective date of the Agreement and continuing through October 31, 2005, Tenant shall pay in advance to City, as rental, a fixed minimum monthly rent of Nineteen Thousand One Hundred Seventy-seven Dollars ($19,177)   The rent is based on 12% annual return on property value at a rental rate of $1.40 per square foot per year for land and $.352 per square foot per year for water, with each rate then discounted by 25% as consideration for Tenant's payment to City of percentage rent as described in Section 4(b) of this Agreement and an additional 25% of the original land rate for Parcel Nos. 4, 5 and 6 reflecting Tenant's participation in the environmental compliance program described in Section 8(d) of the Agreement.  In the event Tenant fails to timely satisfy the requirements of Section 8(d), minimum monthly rent shall be increased to Twenty-one Thousand One Hundred Fifty-one Dollars ($21,151) due to loss of the discount. The increased rate shall take effect ninety-five (95) days after City, acting through its Executive Director, has mailed notice to Tenant listing Section 8(d) requirements which Tenant has failed to meet, provided that if Tenant corrects all deficiencies to the satisfaction of Executive Director within the 95-day period, then the rate increase shall not take effect.  No charge shall be required for the approximately 3,212 s.f. area shown crosshatched on Parcel No. 2 of Exhibit "A" due to limited utility of the land.  However, Tenant shall have maintenance, liability, indemnity, insuring and all other obligations as set forth in this Agreement for its use of the parcel.  The rent shall be due on or before the first day of each month during the term and shall be paid to the Board of Harbor Commissioners and mailed to:

> City of Los Angeles
> Port of Los Angeles
> File No. 53308
> Los Angeles, California  90074-3308

or to such other address as Executive Director designates in writing. The fixed minimum monthly rent shall be subject to adjustment as set forth in Section 4(l) hereof.

Prior to the issuance of this Agreement, Tenant shall deposit with the Harbor Department a sum equal to two (2) months' minimum rental payments as a guarantee to cover delinquent rent and its other obligations under this Agreement.  If the rent is thereafter changed, Tenant shall modify its deposit as necessary to assure that Tenant at all times has on deposit a sum equal to two months of the current rental payments.  If all or any part of said deposit is used to pay any rent due and unpaid or to meet other Tenant obligations, including, but not limited to, maintenance expenses, Tenant shall then immediately reimburse said deposit so that at all times during the life of this Agreement said deposit shall be maintained.  Failure to maintain the full amount of said deposit shall subject this Agreement to forfeiture. In the sole discretion of the Executive Director, Tenant may post other forms of security but only if in a form acceptable to the City Attorney.  No interest is payable by City on deposits if the deposits are subsequently refunded.  If the permit which this Agreement is replacing required Tenant to make a security deposit and

7

such security deposit is still held by City, City shall credit such deposit to the two-month minimum deposit obligation required by this Agreement.  However, such credits do not include any percentage rent which Tenant has paid to City related to boater security rental deposits collected by Tenant which were included in Tenant's gross receipts and payments to City pursuant to the permits now being replaced.

(b)     Percentage Rent.

(1)     In addition to the fixed minimum rents set forth in Section 4(a) above, Tenant shall also pay for the period November 1, 1995 through October 31, 2005, except as noted below, the amount by which the sum of the following percentages of gross receipts exceed the minimum monthly rent for the applicable rental period:

(i)     Twenty-two and one-half percent (22.5%) of gross receipts received or earned from recreational vessel berthing, anchorage, and vessel dry storage for each month from November 1, 1995 through October 31, 2001 (a period of six years), and twenty percent (20%) of gross receipts received or earned from recreational vessel berthing, anchorage, and vessel dry storage for each month from November 1, 2001 through October 31, 2005 (a period of four years); plus

(ii)     Ten percent (10%) of gross receipts received or earned from locker and storage rentals; plus

(iii)     One Hundred Fifty Dollars ($150) or ten percent (10%) of rent paid to Tenant by yacht/boat brokers for new and used yacht/boat sales, whichever is greater; plus

(iv)     One Hundred Fifty Dollars ($150) or ten percent (10%) of rent paid to Tenant by insurance brokerages, whichever is greater; plus

(v)     Three and one-half percent (3 ½%) of gross income from food sales; plus

(vi)     Three percent (3%) of gross retail sales; plus

(vii)     One Hundred Fifty Dollars ($150) or ten percent (10%) of rent paid to Tenant by sublessee(s) for yacht/boat chandlery sales; plus

(viii)     Twenty-five percent (25%) of any commission or other compensation paid to Tenant for the right to install or operate vending, service or game machines or devices, including telephones, or five percent (5%) of gross income from any machines or devices owned, leased or rented by Tenant or sublessees of Tenant; plus

8

(ix)    Five percent (5%) of gross receipts received from all other activities.

The percentage rent shall be subject to readjustment as set forth in Section 4(l) hereof for the five-year periods beginning November 1, 2005.

(2)    Tenant shall prepare and deliver to City within fifteen (15) days after the end of each month, on a City approved form, a written statement signed by Tenant's duly authorized representative showing in reasonable detail the elements and amount of gross receipts during the preceding month.  Payment of the percentage rent shall accompany the written statement. Tenant shall further deliver to City on or before the sixtieth (60th) day after the end of each calendar year of the term of this Agreement, an annual statement, signed by Tenant's duly authorized representative, showing in such reasonable detail the elements and amounts of gross receipts during the preceding calendar year.  When Tenant submits the annual statement to City, Tenant shall pay to City the amount of percentage rent, if any, due, and still unpaid, for the preceding calendar year.  Payment of deferred percentage rent shall be separately identified as such in Tenant's monthly and annual statements.

(3)    The percentage rent is due and payable within fifteen (15) days following the end of the preceding month.  If the Agreement term commences on a day other than the first day of a calendar month, the percentage rent for the first fractional month and the month beginning immediately thereafter shall be due within fifteen (15) days after the end of the month beginning immediately after the first fractional month.  The payment for the last fractional month shall be made within fifteen (15) days after the Agreement term ends.

(4)    Percentage rent for any month-to-month tenancy beyond the Agreement term shall be paid as if the Agreement term commenced with the first day of such holdover.

(5)    If seasonal business causes the percentage rent for any calendar year to fluctuate, Tenant may be eligible for a credit.  The credit amount is the difference between (1) the rent actually paid during the calendar year (assuming Tenant has paid all rent as it becomes due during the calendar year), and (2) Tenant's annual gross receipts multiplied by the percentage figures set forth above.  In no event shall Tenant's total rent be less than the fixed minimum.  Tenant shall be entitled to the credit only if the rent payments due during the calendar year have been timely made.  Tenant may apply any such credit to any future installment of rent due to City under this Agreement.

(c)    <u>Gross Receipts Defined.</u>  The term "gross receipts" used herein includes all charges, sales, fees and commissions made or earned by Tenant, its assignees, sublessees, licensees and permittees, collected from any business, use or operation, or

9

any combination thereof, originating, transacted or performed, in whole or in part, on the Premises pursuant to this Agreement. "Gross receipts" includes, but is not limited to, monies collectible from rentals, services, and the sale or delivery of goods, wares and merchandise, exclusive of retail sales taxes, excise taxes and other direct taxes on the consumer. Notwithstanding the foregoing, "gross receipts" shall not include (i) amounts refunded by Tenant to the payor, (ii) amounts received in reimbursement for Utilities, (iii) amounts received as security deposits, and (iv) "bad debt," as defined herein. The term "bad debt" shall refer only to amounts accrued and payable to Tenant and otherwise reported or reportable by Tenant to City as gross receipts pursuant to subsection (b)(1) of this Section 4, but which amounts were not in fact collected or received by Tenant, as demonstrated by Tenant by evidence satisfactory to City. The amount of bad debt shall be determined on an annual basis. For purposes of determining gross receipts hereunder, Tenant shall apply security deposits to unpaid berthing fees on a first priority basis. Except as expressly set forth herein, no other set-off or deduction against gross receipts is permitted.

(d)    Business Curtailment. If Tenant ceases or substantially curtails its business operation under this Agreement for reasons other than partial or total destruction of the demised Premises, Tenant shall pay percentage rent for that period at the rate at which percentage rent was paid during the three (3) immediately prior years of the Agreement term, or during the period in which this Agreement has been in effect, whichever is the shorter time period.

(e)    Delinquent Rent. Rent payments required to be made by this Section 4 which have not been paid within ten (10) calendar days of the date such payments are due ("grace period") shall be subject to a service charge assessed as additional rent at the rate of 1/30 of two percent (2%) of the invoice amount remaining unpaid each day. Tenant acknowledges it knows the day of the month its rent is due and that the ten (10) calendar day grace period commences from the rent due date, not the date of City's invoice. Said additional rent shall be imposed even if all or a portion of any sum on deposit as a guarantee against delinquent rent is applied to the amount due. The City has the unqualified right, upon thirty (30) days' prior notice to Tenant, to change the level of the delinquency additional rent.

(f)    Records and Accounts. All books, accounts and other records showing the affairs of Tenant with respect to its business transacted at, upon or over the Premises shall be maintained locally, and shall be subject to examination, audit and copy ("examination") by Executive Director's designee. If it becomes necessary to make such examination at any place other than within fifty (50) miles of the Premises, then Tenant shall pay all costs and expenses incident to such examination. These records shall be retained during the Agreement term so that records for the four (4) most recent years are available. After this Agreement ends, Tenant shall maintain the four (4) most recent years' records for at least two (2) years. Upon request in writing by Executive Director's designee, Tenant shall identify the exact location of all records and the name and telephone number of the record custodian. The statement shall be submitted within fifteen (15) days of the request and

10

shall contain such detail and cover such period of time as may be specified in any such request.

(g)    <u>Promotion of Los Angeles Harbor Facilities.</u>  Tenant shall in good faith and with reasonable diligence use its best commercial efforts, suitable advertising and other means to promote the use of the Premises.

(h)    <u>Supervision of Business Practices.</u>  Any and all Tenant business activities on the Premises shall be subject to reasonable Board regulation.  If such business is not conducted reasonably as determined by Board, Board may direct that corrective action be taken by Tenant or its sublessees to remedy such practices.  Upon failure to comply therewith within thirty (30) days of Tenant receiving such written notice, Board may declare this Agreement terminated.

Pursuant to the tide and submerged land grant referred to in Section 5(c) of this Agreement, Tenant and its sublessees shall use the Premises so there shall be no discrimination made, authorized or permitted in the rates, tolls, or charges or in the facilities provided for any use or service in connection therewith.  All charges established and collected by Tenant shall be nondiscriminatory and commensurate with the facilities provided, services rendered and/or size of vessels.

Tenant shall conduct its business and cause the businesses of its sublessees to be conducted substantially in accordance with the provisions of Exhibit "B," "Standards of Operations," which is attached to this Agreement and is incorporated herein by reference. Tenant shall furnish and maintain a standard of service at least equal to that of the better class of similar businesses providing similar services and facilities in the City of Los Angeles and adjacent communities during the entire Agreement term.

(i)    <u>Schedule of Charges.</u>  Tenant shall at all times keep on file with Executive Director of City a current schedule of charges for facilities and services rendered or arising out of use of the Premises.

(j)    <u>Disputed Payments.</u>  Tenant recognizes that disputes may arise over monies due City in accordance with this Agreement.  Tenant and City shall make a good faith effort to resolve any disputes as quickly as possible.  Tenant agrees, upon receiving a billing from City which it disputes, to deposit the disputed amount in cash or by certificate of deposit, in City's name in an escrow account to be mutually agreed upon by the parties within sixty (60) days of the billing date.  The deposit shall be held in escrow pending the resolution of the dispute.  Each party shall share the costs of the escrow account on a 50/50 basis.  If the dispute is resolved in City's favor, City shall receive the money and all accumulated interest.  If the dispute is resolved in Tenant's favor, Tenant shall receive the money and all accumulated interest.  Tenant understands that its failure to provide a deposit acceptable to City within sixty (60) days shall be considered a material Default of this Agreement and City shall be entitled to cancel this Agreement upon thirty (30) days' written notice.  If Tenant is obligated to pay City any charges due under Port of Los

11

Angeles Tariff No. 4 (or its successor) pursuant to this Agreement, then failure to provide a deposit shall require Tenant to make all payments in accordance with Item 265 of the Tariff and Tenant shall be removed from the Credit List authorized by Item 260 of the Tariff or as amended or superseded. This subsection (j) shall not apply to any one billing for a disputed amount exceeding One Hundred Thousand Dollars ($100,000), provided Tenant shall be required to deposit One Hundred Thousand Dollars ($100,000) with City. Notwithstanding the provisions above, if City prevails in the dispute and the amount due City exceeds One Hundred Thousand Dollars ($100,000), Tenant shall pay the difference due within fifteen (15) days with interest at the rate set forth in Section 4(e) from the date of City's initial billing to Tenant.

(k)    <u>Services and Utilities.</u> Unless otherwise provided for herein, Tenant shall pay all charges for services furnished to the Premises or used in connection with its occupancy, including, but not limited to, heat, gas, power, sewer, telephone, water, light and janitorial services, and pay all deposits, connection fees, charges and meter rentals required by the supplier of any such service, including City. Without Tenant's prior written consent, Board shall not impose on Tenant any additional fees or charges for services provided by Board.

(l)    <u>Renegotiation of Compensation.</u> The compensation to be paid by Tenant to Board for each five (5) year period or any portion thereof, commencing with the five-year period beginning November 1, 2005, shall be readjusted as set forth in this subsection (l). Such readjustment of the compensation shall be mutually agreed upon between Tenant and Board at some time not more than nine (9) months and not less than three (3) months before the beginning of each such five (5) year period. As long as the term of this Agreement remains in effect, the compensation shall be established by order of Board; provided that if compensation has not been determined by the beginning of the new five (5) year period, the fixed minimum rent for the new period, subject to the final compensation being negotiated, shall be one hundred twenty-five percent (125%) of the fixed minimum rent for the immediately prior year, which shall be paid in the same manner as provided in Section 4(a) of this Agreement. Board, at its sole discretion by written notice to Tenant, may reduce the percentage increases of one hundred twenty-five percent (125%) to a lesser amount. If negotiation for the new compensation has not begun six (6) months prior to expiration of each five (5) year period, Tenant shall immediately set a date with City to discuss the readjustment of compensation. If Tenant and Board cannot agree upon the amount of such compensation, the compensation for the new period shall be determined in the following manner:

Three appraisers shall be appointed. One appraiser shall be appointed by Board, one by Tenant and the third by the two appraisers so appointed. If such compensation has not been mutually agreed upon within the time above prescribed, Board shall give to Tenant a written notice demanding an appraisal of the fair rental value of the Premises and naming the person appointed by Board to act as an appraiser on its behalf. Within fifteen (15) days from the service of such notice, Tenant shall appoint an appraiser and notify Board of such appointment. If either party shall not have notified the other in writing of the appointment of its appraiser, the Presiding Judge of the Superior Court of the State of

12

California for the County of Los Angeles shall, upon the request of either party, appoint the appraiser for the party so in default. If the two appraisers so chosen shall be unable to agree upon the third appraiser within ten (10) days after the appointment of the second appraiser, the third appraiser shall be appointed by said Presiding Judge. Any vacancy shall be filled by the party who made the original appointment to the vacant place.

The appraisers shall file their opinions concerning the fair rental value of the Premises in writing with Board within sixty (60) days after the appointment of the third appraiser. Such opinions shall take into consideration the uses permitted under this Agreement and all of its Terms, conditions and restrictions. Such opinions shall also take into consideration all of the factors and data relating to such value which may properly be considered in determining the fair value of leaseholds under the Laws of eminent domain in the State of California. If any appraiser fails to file his opinion within said sixty (60) days, a new appraiser shall be appointed in the manner prescribed above.

Upon the filing of three opinions, Board shall properly set a date for, and on said date hold, a public hearing. At such hearing, said opinions and such other evidence of the fair compensation value of the Premises, as may be presented by Tenant or others, shall be received and considered. Based upon such evidence, Board's adopted policy on rate of return and any other relevant factors, Board shall reasonably determine the fair compensation value of the Premises and shall establish the same by order as the compensation to be paid by Tenant for the five (5) year period under consideration.

Each party shall pay the costs and expenses of the appraiser appointed by it, together with fifty percent (50%) of the costs and expenses of the third appraiser.

The monies paid at the one hundred twenty-five percent (125%) rate shall count against the new compensation which shall accrue from the date the new five (5) year period commences. If the new compensation is more than the compensation paid at the one hundred twenty-five percent (125%) rate, Tenant shall immediately pay City the difference due for the period in question. If the new compensation is less than the amount paid at the one hundred twenty-five percent (125%) rate, Tenant shall be entitled to a credit against future sums owed to City under this Agreement. No interest shall accrue on the amount due to City or Tenant pursuant to this provision, except to the extent Tenant fails to pay any deficiency within thirty (30) days of a billing from City. If interest is due, it shall accrue at the rate provided in Item 270 of Port of Los Angeles Tariff No. 4 (or its successor), currently consisting of simple interest of 1/30th of two percent (2%) of the invoice amount remaining unpaid each day.

Section 5.    Uses.

(a)    Permitted Uses. The Premises shall be used for construction, operation and maintenance of a facility for recreational vessel marina and related uses, including dry storage of vessels and for incidental purposes. Tenant may allow berthing occupants to

13

live aboard vessels subject to the limitations set forth in Section 1 which defines "Liveaboards", provided that not more than five percent (5%) of total berthing capacity is so occupied. Liveaboard privileges shall be reduced to five percent (5%) by attrition. Tenant shall provide to City and maintain a listing of liveaboards in the form provided as Exhibit "B". Existing liveaboards living on vessels within the premises may remain provided they are listed on Exhibit "B" when this Agreement commences. Liveaboard status may not be transferred. Tenant may also sell and provide incidental boater products and services, marine supplies and equipment, petroleum products (except fuel), sundry items, refreshments and soft drinks, insurance, conduct a business for the sale/brokerage of new and used boats/yachts, operate a yachting, boating, or sailing club and related club uses, and conduct a boat/yacht repair business. Tenant may allow berthing occupants' vessels to extend beyond the end of their respective berths to the length described in Exhibit "C", so long as such overhang is within the granted premises, but the overhang shall never exceed five (5) feet. Subject to the provisions of Section 10(e) of this Agreement, Tenant may sublease or license the use of the Premises for the marina uses described herein. Tenant may sublease one or more blocks of vessel berths, not to exceed fifty percent (50%) cumulatively of total berthing and not to exceed twenty-five percent (25%) of total berthing to any individual sublessee, subject to approval by Board. Vessel berthing shall be limited to recreational vessels which are seaworthy as determined by the Executive Director in the Executive Director's sole discretion. Notwithstanding the foregoing sentence, those specific structures which constitute Tenant's floating facilities, such as offices, support facilities and other uses as designated on Exhibit "D" attached, may remain on the premises so long as they conform to applicable Building and Safety standards. To be seaworthy, a vessel must be able to withstand the ordinary attacks of wind and weather, must have its own motive power so that it can immediately vacate the marina if so directed by the Executive Director, and must be in a condition which guarantees that it is not and will not cause pollution of any type to harbor waters. Tenant shall remove or cause to be removed any unseaworthy vessels from the marina within six (6) months' written notice from the Executive Director. Tenant shall not use the Premises for any other purpose without the prior written approval of Board. If City so requests, Tenant shall provide City, at Tenant's expense, a marine survey of any vessel which City has reason to believe may be unseaworthy. The survey report must be prepared by a qualified marine surveyor who has conducted a physical inspection of the vessel in question within thirty (30) days of City's request for a survey. Tenant may include in its slip agreement with its subtenants a provision requiring the subtenant to reimburse Tenant the cost of such survey.

(b)    Increased Insurance Rates. Tenant may not use the Premises in any manner, including uses for the granted purposes, which result in cancellation of any insurance that City may have on the Premises or on adjacent premises, or that will cause cancellation of any other insurance coverage for the Premises or adjacent premises. Tenant further agrees not to keep anything on the Premises prohibited by any fire insurance covering the Premises.

14

(c)    <u>State Tidelands Grants.</u>  Tenant agrees not to use the Premises in any manner, including uses for the granted purposes, which will be inconsistent with the limitations, conditions, restrictions and reservations contained in the Act of the California Legislature entitled "An Act Granting to the City of Los Angeles the Tidelands and Submerged Lands of the State Within the Boundaries of Said City," approved June 3, 1929, (Stats. 1929, Ch. 651), as amended, and Article VI of the Charter of the City of Los Angeles relating to such lands.

(d)    <u>Signs.</u>  Except as set forth below, Tenant shall post, erect and maintain on the Premises only signs allowed in writing by Executive Director, and consistent with the Design Guidelines set forth in Exhibit "C", which is attached to this Agreement and incorporated herein by reference.  The Executive Director may require Tenant to remove any signs posted without such approval upon five (5) days' written notice to Tenant. Notwithstanding the foregoing, Tenant may continue to maintain any sign erected on the Premises prior to the date of execution of this Agreement, provided that such sign was maintained in accordance with the Harbor Engineer and the Agreement requirements in effect at the time of sign installation, and provided further, that such signs shall be removed, altered and/or replaced in the time and manner required under Section 7(a)(1) of this Agreement.

(e)    <u>Vessel Relocation.</u>  Any vessel moored in a location that exposes the vessel to the open channel and is deemed by the Executive Director to be a hazard shall be relocated upon written notice from the Executive Director to remove the vessel from the exposed mooring.

Section 6.    <u>Default and Termination.</u>

(a)    <u>Default.</u>  If Tenant does not comply with any Term of this Agreement, other than nonpayment of rent, Executive Director may, at his option, give Tenant forty-five (45) days' written notice to comply with such Term which can be cured provided, however, that if the nature of Tenant's Default is such that more than forty-five (45) days are reasonably required for its cure, then Tenant shall not be deemed in Default if Tenant commences such cure within said forty-five (45) day period and thereafter diligently prosecutes such cure to completion and to City's satisfaction.  If Tenant defaults in payment of rent or other monetary consideration due City, Executive Director may give Tenant a thirty (30) day notice to pay all past due amounts.  If Tenant does not comply with (1) the forty-five (45) day notice to cure a nonmonetary Default, or (2) if payment is not made for delinquent rent or other charges within the thirty (30) day period, at the election of Executive Director, this Agreement is forfeited.  Executive Director may forfeit the Agreement immediately if Tenant has breached a noncurable Term of this Agreement.  Tenant shall immediately surrender all rights in the Premises and all Improvements upon any such forfeiture; all Improvements of any character made pursuant to this Agreement, or any prior agreement, shall become the property of City free of any claim of Tenant or its successors in interest, and without compensation to Tenant or its successors, or become removable by Board at the sole

15

expense of Tenant, at the option of Board. If this Agreement is forfeited, Board may enforce all of its rights and remedies under this Agreement. In addition to any remedy available to City at Law or in equity, City shall be entitled to recover from Tenant rent as it becomes due pursuant to the Terms of this Agreement. In addition, the damage that Board may recover includes the worth at the time of the award of the amount by which the unpaid rent for the balance of the term of this Agreement, or five (5) years after the time of the award, whichever period is shorter, exceeds the amount of such rental loss for the same period that Tenant proves could have been reasonably avoided. If City has consented in writing to Tenant's assignment of this Agreement to a lender for security purposes pursuant to Section 10, then lender shall have the right to cure Tenant's curable defects in the manner set forth in Section 10 and in City's consent to a particular assignment of this Agreement.

(b)   Thirty (30) Day Nonuse. If Tenant fails to use the Premises or any substantial portion thereof for a period of more than thirty (30) consecutive days without the consent of Executive Director, Executive Director may declare this Agreement forfeited upon thirty (30) days' notice to Tenant; provided, if failure to use is caused by the following events: reason of war, bona fide strikes not caused by Tenant or to which Tenant is not a party, riots, civil commotion, acts of public enemies, earthquake, other natural disaster or action of the elements, and Tenant so notifies the Executive Director within ten (10) days from the date the period of failure to use began, such period of nonuse shall be excluded in computing the thirty (30) day period. Vacancy of any individual recreational berthing and anchorage or rental unit shall not constitute nonuse or a force majeure event.

(c)   Termination by Court Decree. If any court renders a final decision effectively preventing the performance by City or Tenant of any of its obligations under this Agreement, then either party to this Agreement may terminate this Agreement by written notice. Thereafter, all rights and obligations under this Agreement (with the exception of any undischarged rights and obligations that accrued prior to the effective date of termination) shall terminate.

(d)   Termination by Destruction of Premises. If the major structures owned by Tenant are totally destroyed by fire not resulting from Tenant's fault, or by earthquake or other natural disaster, or are so nearly destroyed as to require rebuilding, Tenant shall make a determination, subject to approval by Board which shall not unreasonably be withheld, as to whether this Agreement shall be terminated or continued within ninety (90) days from the date of destruction and shall give written notice of same to City. If Tenant determines that the Agreement is to be terminated, then the rent shall be paid to the date such destruction occurred and the Agreement shall terminate. Neither party shall have any further rights or obligations, except that Tenant shall pay all rent accrued to the date of destruction and shall comply with the obligations set forth in Section 8, subsections (b) and (c) of this Agreement. Damage or injury equal to fifty percent (50%) of the replacement value of the major structures owned by Tenant shall constitute a total destruction thereof. If Tenant determines that the Agreement shall be continued, Tenant shall within the 90-day period provided herein present to Board a written proposal and schedule for reconstruction

16

of all major structures for approval by Board, which shall not unreasonably be withheld. If Board approves Tenant's proposal for reconstruction and for the continuation of this Agreement, the same shall continue in full force and effect provided that Tenant commences reconstruction within ninety (90) additional days following approval by Board and diligently proceeds to complete such reconstruction with the period of time as mutually agreed upon by Board and Tenant. City and Tenant agree that the Terms of this Agreement shall govern the effect of any damage to or destruction of the Premises with respect to the termination of this Agreement; to the extent permitted by Law, the parties hereto mutually waive the provisions of any present or future statute to the extent it may be inconsistent with the provisions of this subsection.

(e)    Bankruptcy, Credit Arrangements, Attachments, Tax Liens. Except as provided in Section 10(d) of this Agreement or by Law, the occurrence of any of the following events shall constitute a material Default and breach of this Agreement:

(1)    Any general assignment, or general arrangement for the benefit of creditors by Tenant;

(2)    The filing by or against Tenant of a petition to have Tenant adjudged a bankrupt or a petition for reorganization or arrangement under any Law relating to bankruptcy, which petition has not been dismissed within sixty (60) days;

(3)    The appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Agreement, which appointment has not been dismissed within sixty (60) days; or

(4)    Any attachment not discharged within sixty (60) days.

The seizure of the Premises by the Internal Revenue Service shall automatically terminate this Agreement without any notice by City to Tenant if not dismissed within sixty (60) days of such seizure.

Section 7.    Improvements.

(a)    Plan Approvals. Subject to the provisions of Section 7(a)(1) through (a)(7) below, all new Tenant Improvements shall conform to the criteria set forth in Exhibit "C" (the "Design Criteria"). Prior to constructing any new Tenant Improvements, Tenant must obtain a Harbor Engineer's General Permit and shall first submit drawings, plans, and specifications for Harbor Engineer's approval. Harbor Engineer may order changes in drawings, plans and specifications submitted by Tenant at Tenant's expense. Tenant construction shall comply with the conditions set forth in the Harbor Engineer's Permit. The approval of Harbor Engineer, as provided in this Section 7, shall not constitute a representation or warranty that Tenant's plans conform to applicable law or Exhibit "C".

17

(1)    Mandatory Tenant Submitted Development Plan. Tenant shall, on or before July 8, 2002 at noon, submit for approval by the Review Board described in Section 1 of this Agreement and more fully in Section B.1 of Section 1 of Exhibit C (the East Basin/Cerritos Channel Marinas Area Lease Development and Design Criteria) a development plan ("Development Plan"). The Development Plan shall delineate the repairs, refurbishments and/or replacements of the Tenant Improvements that Tenant will make to the Premises in order for the Premises to meet the applicable design criteria and requirements set forth in the Design Criteria. The Review Board will approve, deny and/or recommend modifications to the Development Plan. If City deems modifications are necessary, Tenant shall resubmit the Development Plan with such modifications to the Review Board. The Development Plan shall include a detailed schedule showing when Tenant will:

- complete and submit its design to the Harbor Department;

- apply for a Harbor Engineer's permit;

- obtain environmental reviews related to the California Environmental Quality Act, Coastal Act, and other applicable environmental laws;

- apply for Building and Safety permits;

- obtain construction funding;

- start construction;

- start and complete identified construction milestones; and

- complete all construction.

Tenant shall complete the repairs, refurbishments and/or replacements of the Tenant Improvements as set forth in the Development Plan as approved by the Review Board on or before July 6, 2006 (the "Improvement Completion Date"). Tenant's failure to timely complete the Development Plan improvements shall entitle City to terminate this Agreement in the manner set forth in Section 3(a) and to retain the credit described in Section 4(a).

(2)    Type I and Type II Improvements. Type I improvements are those repairs, refurbishments or replacements (collectively "modifications") made to existing improvements when the modifications do not change the footprint or configuration of the improvements. The term "footprint" means the present location

(Revised 2/12/02)

18

and square footage of the improvement being modified. The term "configuration" means the shape, orientation, size and capacity of the improvement being modified.

A Type II improvement involves construction of a new improvement or modification to an existing improvement which creates a new footprint or configuration or modifies an old footprint or configuration.

Thus, by way of example only, if an existing floating dock improvement occupies 20,000 square feet and can accommodate 40 vessels each 30 feet in length within slips which are parallel, proposed modifications to this dock are Type I if none of these characteristics change. But, if the proposed modifications change the square footage or number of vessels accommodated or vessel lengths or parallel positioning of the vessels, then a Type II improvement will exist.

Similarly, if a building has 2,000 square feet, is one story, and has a certain orientation on the premises, proposed modifications are Type I if none of these characteristics change. But, if the proposed building square footage changes, or if the number of stories changes, or if the orientation of the building on the premises changes, then a Type II improvement will exist.

The Exhibit "C" Design Criteria which govern improvements described in Tenant's Development Plan comprise three sections as follows:

- Section 1 -  "East Basin/Cerritos Channel Marinas General Lease Development and Design Criteria Applicable to All Marinas",

- Section 2 -  "Type I Improvements - Minimum Requirements and Specifications for Rehabilitation/Replacement of Improvements in East Basin/Cerritos Channel Marinas", and

- Section 3 -  "Type II Improvements - Layout and Design Guidelines for Small Craft Berthing Facilities Produced by the State of California State Department of Boating and Waterways" (the "DBAW criteria").

Type I improvements must comply with Section I and Section II of Exhibit "C" except that Type I improvements shall be exempt from the requirements of the following subsections of Part II of Section 1 of Exhibit "C" to the extent these subsections refer to the DBAW criteria: (a) the third paragraph of Subsection A.3, Subsections F.6, H.1, and H.2, and (b) exempt from the DBAW criteria. Notwithstanding the foregoing sentence, where safety, health, access and/or other compelling situations require application of particular Section 3 DBAW criteria to

19

Type I improvements as determined by the Review Board. Tenant must use the DBAW criteria selected by the Review Board for Type I improvements.

Type II improvements shall comply with Sections 1, 2 and 3 of Exhibit "C".

(3)    Force Majeure.    The time for performance of Tenant's obligations under Section 7(a)(1) shall be extended by delay caused by any of the events described in Section 6(b) if such events interfere with actual construction work on the premises (each an "Event of Force Majeure").    Similarly, such time for performance shall be extended if an injunction issued by the courts prevents or delays work on the Improvements.  If Events of Force Majeure or a court injunction extend the Improvement Completion Date set forth in Section 7(a)(1) hereof, then the Improvement Completion Date as set forth in Section 3(a) shall be extended for an equivalent period of time.

(4)    Variance.    Tenant may apply to the Review Board for a variance from the Design Guidelines where, because of special circumstances applicable to the Premises, including size, shape, topography, location or surroundings, (a) the strict application of the Design Guidelines would result in unnecessary hardship or practical difficulties in connection with the development of the Premises, and (b) the variance is necessary for the preservation and enjoyment of a substantial property right or use generally possessed by other property in the same zone and vicinity but which, because of the special circumstances and practical difficulties or unnecessary hardships, is denied to the property in question.  The Review Board may grant such a variance where it is established to the Review Board's satisfaction that such special circumstances justify a variance.  The Review Board will not, however, entertain variances from the Department of Boating & Waterways' standards unless the Review Board finds, in its sole discretion, that Tenant's premises cannot be reasonably altered to meet such standards.  When reviewing requests for variance, the Review Board acts on behalf of the City acting as a landlord in its proprietary capacity, not as a governmental body exercising the police power.  Accordingly, the procedures to be used for reviewing variances and the standards to be applied shall be solely in the Review Board's discretion.

(5)    State Department of Boating & Waterways Requirements. Notwithstanding the foregoing provisions of this Section 7(a)(1) through (4), if the State of California Department of Boating and Waterways ("DBAW") requires Tenant improvements to conform to the State Guidelines contained in Section 3 of Exhibit "C" as a result of any DBAW loans for which Tenant applies, then all Tenant improvements shall conform to DBAW standards.

(6)    Surety Bond for Completion of Development Plan Repair, Refurbishment, and/or Replacement Construction.  In addition to other security under this Agreement, Tenant shall provide City a surety bond to assure completion of Development Plan construction if notified in writing by Executive Director that

20

such completion bond is required. The bond amount shall be determined by Executive Director, based upon the value of the Review Board approved Development Plan improvements to be constructed and shall be included in Executive Director's written notification to Tenant.

(7)    Mid-term Independent Inspection of Land and Water Improvements. On or after November 1, 2010, the Harbor Department shall, at its option, arrange an independent inspection of any or all of the Cerritos Channel Marinas to determine the existing condition of land and water improvements. For improvements that have not been replaced within the term of this Agreement, replacement may be required where the independent source determines that replacement is necessary to ensure good quality for the remaining term of the Agreement. For all other improvements, repairs/refurbishment may be required to ensure good quality for the remaining term of the Agreement. The Executive Director shall give Tenant written notice of any repairs, refurbishment, and/or replacement construction that will be required at Tenant's expense to maintain the marinas to standards of maintenance and quality under this Agreement.

(b)    Cost of Permits and Construction. Tenant, at its own expense, shall obtain all necessary permits and shall pay for construction of its Tenant Improvements. Tenant shall keep the Premises and Tenant Improvements constructed free and clear of liens for labor and materials and shall hold City harmless from any responsibility in respect thereto.

(c)    Notices. Tenant shall give written advance notice to Harbor Engineer of the date it will commence any construction and shall notify Harbor Engineer of the date construction is completed. Within thirty (30) days after such completion, Tenant shall file with the Harbor Engineer a verified statement of the cost of the labor and material used. Tenant shall also file with Harbor Engineer, in a form acceptable to Harbor Engineer, a set of "as built" plans.

(d)    Ownership. All Tenant Improvements upon the Premises shall be and remain the property of Tenant, subject to the Agreement Terms.

(e)    City Improvements. City and Tenant shall confer commencing May 1, 2001 to identify and schedule City Improvements to signage, access roadways, roadway lighting, landscaping, and parking outside the Premises granted by this Agreement.

Section 8.    Maintenance and Restoration.

(a)    Maintenance.

(1)    Maintenance Performed by Tenant at Its Expense. Tenant shall perform and pay for maintenance and repairs to all Tenant Improvements on the Premises. Except as provided in Section 8(a)(6) hereof, Tenant shall also inspect

21

and maintain the entire Premises, including without exception the improvements provided by City (if any), in a safe, clean, sanitary and sightly condition to the Executive Director's reasonable satisfaction. Tenant shall also comply with the Marina Janitorial Standards and Marina Maintenance Standards set forth in Exhibit "B". Modifications and repairs shall be made in a manner at least equal to that of the better class of similar businesses providing similar services in the City or adjacent communities using materials of a kind and quality comparable to the items being replaced. Tenant shall be responsible at its expense for the safe and lawful removal and disposition of any floating or sunken debris, sunken vessels and hulks from slips and water areas within the Premises. Tenant shall be responsible for the immediate removal of such property.

(2)    <u>Tenant's Responsibility for Damage.</u> If Tenant or its officers, agents, employees, sublessees, contractors, invitees or customers damage the Premises, Tenant shall be responsible for repairing the damage. City shall have the option of requiring Tenant to make the repairs or of the City itself making the repairs, using the procedures in the next paragraph.

(3)    <u>City's Option to Perform Work at Tenant's Expense.</u> If Tenant does not repair or maintain the Premises as required by the previous paragraph, Executive Director may give thirty (30) days' written notice to Tenant to correct, but no notice shall be required where, in the Executive Director's opinion, a hazard to persons or property exists. If Tenant does not make corrections within the time specified in such notice, Executive Director may, at his option, but is not required to, enter the Premises and make the corrections. The costs of the corrections, including labor, materials, equipment and administrative overhead, shall be payable as additional rent by Tenant with the next rent payment. If City deems it necessary to maintain or repair the Premises, Tenant shall cooperate fully with City to assure that the work can be performed timely and during City's normal working hours.

(4)    <u>Inspection of Premises and Tenant Repairs.</u> City may enter the Premises and the Tenant Improvements at all reasonable times, but shall have no obligation to inspect nor liability for failure to inspect the Premises or the Tenant Improvements.

(5)    <u>City's Actual Costs.</u> If City maintains or repairs any portion of the Premises which is the responsibility of Tenant hereunder, City may, following a public hearing before Board, assess a monetary sanction as additional rent in an amount equal to one hundred ten percent (110%) of City's costs for such maintenance and/or repairs. The City's maintenance costs includes all direct and indirect costs which City incurs, such as labor, material and equipment costs, and administrative overhead and burden, whether City uses its own forces or independent contractor.

(6)   <u>City's Maintenance Obligations.</u>  City, at  City's expense, shall maintain and repair all revetments, breakwaters and retaining slopes, breakwaters and other improvements owned by City located on or adjacent to the Premises, provided that Tenant shall keep such revetments, slopes, breakwaters and other such improvements within the Premises free and clear of rubbish and trash, and further provided that Tenant shall be responsible at Tenant's expense for the repair of any damage to such City owned improvements caused by Tenant or any of Tenant's officers, employees, agents, sublessees, contractors, invitees or customers. Tenant shall not be responsible for the maintenance, repair or costs thereof of any improvements associated with Utilities which may be located adjacent to the Premises.  If City maintains any Utilities adjacent to the Premises which provide service to the Premises, City, at its cost, shall continue to be responsible for the maintenance of such Utilities during the term of this Agreement.  City shall not be responsible for performing dredging on or adjacent to the premises.

(b)   <u>Restoration and Surrender of Premises.</u>

(1)   <u>Restoration.</u>  Unless the term is extended before it expires or is terminated, Tenant shall remove, at its expense, everything it or its predecessor owns or has constructed, and shall leave the Premises free from Hazardous Material arising from its use of the Premises. Tenant shall leave the surface in a clean, level, graded and compacted condition.  Tenant shall leave all City Improvements.

(2)   <u>Charges After Termination.</u>  If Tenant does not complete restoration before this Agreement expires, Tenant must still vacate the Premises but shall continue to pay City an amount equal to the fair market rental value of the Premises as if restored, at the Harbor Department's rate of return, but not less than provided in Section 4, until Tenant completes restoration of the Premises.

(3)   <u>Surety Bond for Hazardous Material Cleanup.</u>  In addition to other security under this Agreement, if the Premises become contaminated with Hazardous Materials as a result of or arising from Tenant's operations upon the Premises, Tenant shall also provide City a surety bond in a form acceptable to the City Attorney to assure removal of Hazardous Material caused by Tenant upon City's demand. The bond amount shall be determined by Executive Director, based upon a reasonably detailed estimate by an independent contractor with at least three (3) years relevant experience.

(c)   <u>Hazardous Material.</u>

(1)   <u>Hazardous Materials on the Premises.</u>  Tenant may not have on the Premises any Hazardous Material in such quantities as would require reporting to any person or agency having jurisdiction thereof without first receiving Executive Director's written permission.

23

(2)    Site Testing and Characterization. If Hazardous Materials arising from Tenant's use under this Agreement or Permit No. 313 are on the Premises or have contaminated or threaten to contaminate adjacent areas, Tenant shall immediately notify the City. Tenant shall, at its own expense, perform soil and groundwater tests legally required and as City deems necessary and immediately remediate the contamination to the Executive Director's reasonable satisfaction.

In addition, if the Premises become contaminated with Hazardous Materials as a result of or arising from Tenant's operations at any time during the term, Executive Director may give written notice to Tenant, and within sixty (60) days thereof, Tenant shall prepare and submit to City a site characterization plan sufficient to determine the extent of soil and groundwater contamination on the Premises. The plan shall include a detailed program complying with applicable Laws. Tenant shall provide more information if City deems the plan inadequate. Once the plan is approved, Tenant shall forthwith start sampling and analyzing soil and groundwater in accordance with the plan. Tenant shall provide to City the results as they become available. The sampling and analyses shall be completed and the results submitted to City within forty-five (45) days of notice of City's approval. The foregoing deadline shall be extended if reasonably necessary.

Any tests required of Tenant shall be performed by a California Department of Health Services certified testing laboratory acceptable to City. Tenant hereby irrevocably directs any such laboratory to provide City, upon City's written request, copies of the laboratory reports, test results, and data gathered.

(3)    Site Remediation. When required by applicable Law or by the provisions of subsection (b) of this Section 8, Tenant shall immediately clean up and remove any Hazardous Material arising from its occupancy of the Premises. If the lead governmental agency having jurisdiction of such clean up, or, if City is the lead agency, Executive Director, determines the Hazardous Material cannot be remediated on site to the satisfaction of the lead agency, Tenant shall remove all Hazardous Material and replace it with clean soil or material suitable to City.

When a site characterization plan has been approved, upon written notice from the Executive Director, Tenant shall prepare and submit to City a remediation action plan for removal and monitoring such Hazardous Material caused by or arising from Tenant's operations. The plan shall discuss alternatives and a timetable for each restoration phase. The remedial action plan shall conform to all applicable Laws. Tenant shall submit its remediation plan for review no later than sixty (60) days after receiving City's written notice to prepare it. Upon plan approval, Tenant, at its sole expense, to the satisfaction of the lead agency and in accordance with all applicable Laws, shall take immediate steps to remediate all Hazardous Material and perform such soil and groundwater testing as City or other lead agency deems necessary to assure the Premises are free from Hazardous Materials

24

caused by or arising from Tenant's operations upon the Premises. The foregoing deadline shall be extended if reasonably necessary.

Tenant shall provide City copies of all off-site disposal records, including a copy of each uniform hazardous waste manifest. The City shall not appear on any manifest document as a generator of such material.

(d)    Environmental Compliance Audit, Site Characterization, and Site Remediation Work Plan.    *A.C.*

(1)    Acknowledgment of Boat Repair Operations.    Tenant acknowledges that, as part of its marina operations at the location granted by this Agreement, it has operated a boat repair facility for some time pursuant to an earlier permit from City.  Tenant further acknowledges that such repair operations have involved painting and paint removal, engine repairs, and vessel cleaning and that such operations may have involved the use of hazardous materials, including, but not limited to, fuel oils (gasoline, kerosene, diesel, motor oil), paint strippers, anti-fouling paints containing heavy metals and organo-metallic compounds, thinners, degreasing solvents, acids, alkalis, phenols, cyanide, and heavy metals.  Tenant further acknowledges that City is willing to grant and maintain in force this successor Agreement only if Tenant timely complies with the requirements of this Section 8(d).  Tenant shall identify hazardous substances on the premises, develop a work plan for their removal, and complete the removal of such substances within five (5) years of the date this Agreement becomes effective unless City's Executive Director otherwise agrees in writing.

(2)    Site Audit, Preliminary Site Assessment and Testing Work Plan Provided by City.    City, through Harbor Department's designated consultant ("Consultant") has conducted a brief environmental compliance audit ("Audit") of Tenant's existing work methods and practices.    The Audit includes recommendations for changes in Tenant's work methods, practices and operations.  Consultant has also prepared a preliminary site assessment ("Site Assessment") and testing work plan ("Test Plan") for the boat repair yard premises, shown as Parcel Nos. 4, 5 and 6 on Exhibit A.  Tenant shall fully implement the changes recommended by Consultant as a result of the Audit within six months from the effective date of this Agreement, unless Tenant can demonstrate to the sole satisfaction of the Harbor Department that different changes would be more beneficial in achieving a successful housekeeping program within the six-month period.

Consultant provides this Audit, Site Assessment and Test Plan to assist Tenant in meeting its environmental maintenance, management, and clean-up obligations under the Agreement with no representation or guarantee that the recommended changes in events, work methods, operations, and practices will result in full compliance with all applicable environmental regulatory requirements.

25        (Revised 6/11/02)

Rather, they are meant to promote and augment Tenant's efforts to prevent potential future contamination of the property. In addition, Tenant recognizes that the Audit did not include the taking of any soil or water samples and did not include a comprehensive review of Tenant's past operating procedures or hazardous materials handled.

(3)    Site Characterization and Remediation Work Plan Provided by Tenant. The Site Assessment and Test Plan provided by City shall serve as a first step toward Tenant's preparation of a complete site characterization of the premises ("Site Characterization") and Tenant's clean-up work plan for remediation of the premises ("Remediation Work Plan"). Within three months from the effective date of the Agreement, Tenant shall have completed testing indicated in the Test Plan and shall commence the Site Characterization of the premises, using the information obtained from the Site Assessment and results of Tenant's tests pursuant to the Test Plan.

Within one year from the effective date of the Agreement, Tenant shall have completed its Site Characterization of the premises and the operations conducted thereon. Within that same one-year period, Tenant shall also have commenced and completed preparation of the Remediation Work Plan for the complete clean-up of all contamination of the premises, which shall also include measures to prevent the occurrence of further contamination of the premises. Tenant shall not be responsible for migratory contamination originating from activities other than Tenant's at neighboring location provided that the burden of proof shall be on Tenant to prove that the contamination was caused by off-site activities and not by its own operations. Such migratory contamination shall not excuse Tenant from remediating any condition Tenant has caused even if such remediation can not be accomplished without also removing migratory contamination. Tenant is responsible for all contamination it and its agents, contractors and invitees to the premises have caused. The testing, Site Characterization and Remediation Work Plan must conform with the Port Site Characterization Guidelines for Shipping and Boat Building Facilities dated November 1994, as such guidelines may be amended during the term of this Agreement. The Site Characterization Guidelines are available from the Harbor Department Environmental Division. Tenant acknowledges reviewing such guidelines prior to entering into this Agreement. All work done pursuant to this section is to be commenced only with the prior approval of Harbor Department Environmental and Engineering Divisions. Tenant shall implement any changes, alterations, or additions to the Remediation Work Plan required by these Divisions to obtain approval by the Executive Director. Upon receiving approval of the Remediation Work Plan, Tenant shall commence all remediation work in accordance with the Remediation Work Plan that can be accomplished without seriously disrupting continued operation of its business.

Regardless of the time frame above, or the expiration of the Agreement, Tenant is obligated to fully remediate the premises under the Agreement in accordance with all applicable sections of the Agreement to the full and complete satisfaction of the City. Further, Tenant understands and agrees that the provisions of this section do not alter or change any of the other terms and conditions of the Agreement.

(4) <u>Non-compliance.</u> If Tenant fails to timely satisfy the requirements of this Section 8(d), the compensation due under this Agreement shall automatically adjust as provided in Section 4(a). In addition, Executive Director shall have the absolute right to terminate this Agreement upon first providing Tenant sixty (60) days' prior notice.

(e) <u>Inspection of Premises.</u> Executive Director shall have the right to enter the Premises and Tenant Improvements at any reasonable time to determine compliance or for any other purpose incidental to the rights of City. The right of inspection imposes no obligation on City to inspect, and imposes no liability on City for failure to inspect. By reserving the right to inspect, City assumes no responsibility or liability for loss or damage to Tenant's property or property under Tenant's control, whether caused by fire, water or other causes, nor shall City have nor does it assume responsibility for any shortages of cargo handled by Tenant at the Premises.

(f) <u>Contamination Not Caused by Tenant.</u> Notwithstanding any other provision of this Agreement, and subject to the provisions of this subsection, Tenant shall have no responsibility or liability whatsoever for the assessment, remediation or removal of any Hazardous Material on, under or adjacent to the Premises which did not result or arise from Tenant's operations and uses upon the Premises under this Agreement or Permit No. 313. In the event that the presence of Hazardous Material is newly discovered on or under the Premises at any time during Tenant's occupancy, it shall be and remain the responsibility of Tenant to demonstrate to City's reasonable satisfaction that Tenant's operations did not cause or contribute to the presence or release of such Hazardous Material upon the Premises.

Section 9.    <u>Indemnity and Insurance.</u>

(a) <u>Indemnity.</u> Except for the sole negligence or wilful misconduct of City or as otherwise set forth in this Agreement, Tenant shall relieve, indemnify, protect and save harmless City and its boards, officers, agents and employees from any claims and demands, actions, proceedings, losses, liens, costs and judgments of any kind and nature whatsoever, including expenses incurred in defending against legal actions, for death of or injury to persons, or damage to property, including property owned by or under the care and custody of City, and for civil fines and penalties, that may arise from or be caused directly or indirectly by:

27

(1)    Any dangerous, hazardous, unsafe or defective condition of, in or on the Premises, of any nature whatsoever, which may exist by reason of any act, omission, neglect, or any use or occupation of the Premises by Tenant, its officers, agents, employees, sublessees, licensees or invitees;

(2)    Any operation conducted upon or any use or occupation of the Premises by Tenant, its officers, agents, employees, sublessees, licensees or invitees under or pursuant to the provisions of this Agreement or otherwise;

(3)    Any act, omission or negligence of Tenant, its officers, agents, employees, sublessees, licensees or invitees, regardless of whether any act, omission or negligence of City, its officers, agents or employees contributed thereto;

(4)    Any failure of Tenant, its officers, agents or employees to comply with any of the Terms or conditions of this Agreement or any applicable federal, state, regional, or municipal Law, ordinance, rule or regulation; or

(5)    The conditions, operations, uses, occupations, acts, omissions or negligence referred to in subdivisions (1), (2), (3) and (4) of this subsection (a), existing or conducted upon or arising from the use or occupation by Tenant or its invitees on any other premises within the Harbor District, as defined in the Charter of City.

Except as otherwise set forth in this Agreement, Tenant also agrees to indemnify City and pay for all damages or loss suffered by City and the Harbor Department, including, but not limited to, damage to or loss of City property, to the extent not insured by City, and loss of City revenue from any source, caused by or arising out of the conditions, operations, uses, occupations, acts, omissions or negligence referred to in subdivisions (1), (2), (3), (4) and (5) of this subsection (a). The term "persons" as used in this subsection (a) shall include, but not be limited to, officers and employees of Tenant. Tenant shall also indemnify, defend and hold City harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, diminution of the value of the Premises, damages for loss or restriction on use of rentable or useable space or of any amenity of the Premises, damages arising from any adverse impact on marketing of space, and sums paid in settlement of claims, attorneys' fees, consultant fees and expert fees) which arise during or after the Agreement term as a result of contamination of the Premises by Hazardous Materials for which Tenant is otherwise responsible under the Terms of this Agreement. This indemnification of City by Tenant includes, without limitation, costs incurred in connection with any investigation of site conditions or any clean up, remedial, removal or restoration work required by any federal, state or local governmental agency because of Hazardous Material present in the soil or groundwater on or under the Premises caused by Tenant or arising from Tenant's operations. The foregoing indemnity shall survive the expiration or earlier termination of this Agreement.

28

(b)   <u>Insurance.</u>  Tenant shall procure and maintain at its expense and keep in force at all times during the term of this Agreement the following insurance:

(1)   <u>Public Liability and Property Damage.</u>  Broad form comprehensive public liability and property damage insurance (including comprehensive general liability and automobile) written by an insurance company authorized to do business in the State of California rated VII, A- or better in Best's Insurance Guide (or an alternate guide acceptable to City if a Best's Rating is not available) with Tenant's normal limits of liability, but not less than One Million Dollars ($1,000,000) for injury or death to one person and One Million Dollars ($1,000,000) for injury or death to more than one person arising out of each accident or occurrence and One Million Dollars ($1,000,000) for property damage for each accident or occurrence.  Said limits shall be without deduction, provided that Executive Director may permit a deductible amount in those cases where, in his judgment, such a deductible is justified by the net worth of Tenant.  The insurance shall include a severability of interest clause.  In all cases, regardless of any deductible, said insurance shall contain a defense of suits provision.  Where Tenant operates watercraft or incurs other marine liability exposures, liability coverage for such craft must be provided as above.  Tenant shall furnish two original copies of the endorsement on a form provided by City.

(2)   <u>Fire Legal Liability.</u>  None required at this time; however, upon thirty (30) days' prior written notice to Tenant at any time during the term of this Agreement, Tenant shall provide, either by endorsement to its general liability policy or by separate policy, fire legal liability insurance with a minimum limit of One Hundred Thousand Dollars ($100,000), covering Tenant's legal liability for damage or destruction to the works, structures and Improvements owned by City with waiver of subrogation in favor of Tenant so long as permitted by Board's fire insurance policy.  Neither City nor Board should be named as additional insureds on this policy.  The Executive Director may change the minimum liability limit on thirty (30) days' written notice to the deductible amount of the Harbor Department's fire insurance policy.  Tenant shall furnish two original copies of the endorsement on a form provided by City.

(3)   <u>Fire and Extended Coverage Insurance.</u>  Tenant shall provide fire and extended coverage insurance covering fifty percent (50%) of the replacement value of Tenant's dock system and ninety percent (90%) of the replacement value of other Tenant Improvements.  Subject to the provisions of Section 6(d) of this Agreement, if loss or damage by fire or other peril occurs to any of the Tenant Improvements, Tenant shall commence repairs within ninety (90) days after the loss and shall diligently prosecute such repairs to completion.

29

(4)    Notice of Cancellation. Each insurance policy described above shall provide that it will not be canceled or reduced in coverage until after Board and the City Attorney of City have each been given thirty (30) days' prior written notice by registered mail addressed to P.O. Box 151, San Pedro, California 90733-0151.

(5)    Copies of Policies. Two duplicate original certificates of insurance on forms provided by the Department shall be submitted. The endorsements must be approved by the City Attorney of City.

(6)    Renewal of Policies. At least sixty (60) days prior to the expiration of each policy, Tenant shall furnish to Board new endorsements showing new coverage. If Tenant does not secure the required insurance, Board may, at its option and at the expense of Tenant, obtain the insurance for Tenant.

(7)    Modification of Coverage. Executive Director, at his reasonable discretion, after considering recommendations of insurance consultants or Board's Risk Manager, may increase or decrease amounts and types of insurance coverage required at any time by giving ninety (90) days' written notice to Tenant.

(c)    Accident Reports. Tenant shall give written notice within fifteen (15) days after any accident or occurrence involving death of or substantial injury to any person or persons, or damage estimated in excess of Fifteen Thousand Dollars ($15,000) to property, occurring upon the Premises, or elsewhere within the Harbor District, involving Tenant's officers, agents or employees. Such report shall contain to the extent available (1) the name and address of the persons involved, (2) a general statement as to the nature and extent of injury or damage, (3) the date and hour of occurrence, (4) the names and addresses of known witnesses, and (5) such other information as may be known to it.

(d)    Language to be Inserted in Marina Berthing Agreements. Tenant agrees that it will include in all new marina berthing agreements and subleases a provision as follows, or a substantially similar provision approved by Executive Director:

"Marina Tenant and subtenant understand that this marina is in a heavily industrialized area and that neither City nor Marina Operator can prevent damage caused by prop wash from passing vessels, noise, dust and other pollution, or other harm to vessels berthed in the marina. Accordingly, Marina Tenant hereby (1) assumes the risk of loss to vessels it berths in the marina and any related bodily or personal injury; (2) agrees to waive any claims it may have arising from using the marina, whether involving property damage, bodily injury or personal injury, which are allegedly caused by the City of Los Angeles or the City's tenants or their invitees, their officers, agents and employees; (3) agrees to purchase insurance to cover property damage, bodily injury or personal injury it might sustain and to require the

30

insurer to include in such policy a waiver of subrogation provision; and (4) agrees to defend and indemnify the City and its tenants and their agents, officers, employees and invitees from and against any claims arising from Marina Tenant's use of this marina."

Section 10.    Assignment and Sublease.

(a)    Assignments/Subleases Restricted.    Except as otherwise provided in this Section 10, Tenant may not assign this Agreement during the first five (5) years of the term hereof, but may thereafter assign this Agreement upon the City's prior written approval of the Board of Harbor Commissioners, which approval shall not unreasonably be delayed or withheld, upon the conditions set forth in the balance of this subsection (a).  Any attempted assignment without prior Board approval shall be null and void.  It shall be prohibited to sell or to permit the sale of any individual berth.  Attempted assignments include any assignment, sublease, transfer, gift, hypothecation, grant of control, or other encumbrance of this Agreement or any interest therein or any right or privilege thereunder accomplished in any manner directly or indirectly and whether voluntary or by operation of Law.  Ordinary and customary agreements between Tenant and marina customers and slip tenants for the use of marina berths or storage facilities in the ordinary course of Tenant's operations for the uses and purposes permitted by this Agreement shall not be considered assignments or subleases for purposes of this Section 10 and shall not require the approval of City.  With respect to any assignment of this Agreement or any interest herein for which Board's approval is required, Tenant shall demonstrate by written evidence reasonably satisfactory to Board that all of the following conditions are met, provided that Board may in its sole discretion waive any such condition:

(1)    The proposed assignee's experience in marina operations, financial record and strength are at least as good as those of Tenant both at the time this Agreement was entered into and at the time of the proposed assignment; and

(2)    Before any assignment for which the approval of Board is required shall become effective, Tenant shall pay to Board a transfer fee in an amount equal to fifteen percent (15%) of any "excess proceeds," as defined hereinbelow, from such assignment. The term "excess proceeds" means the total amount payable to Tenant for such assignment less (i) the in place value of any Tenant Improvements constructed by Tenant, and (ii) the total "deductible expenses" relating to such transfer. "Deductible expenses" are customary and usual expenses, in reasonable amounts, actually paid by Tenant to third parties other than any affiliate, officer or employee of Tenant in connection with a sale or financing, including sale or mortgage brokerage commissions, legal fees, title insurance and survey fees, escrow fees, transfer and recording taxes and fees, loan commitment fees, points or prepayment penalties; provided, however, that with respect to any given

31

assignment, deductible expenses shall not exceed ten percent (10%) of the gross sales price generated by such assignment.

(3)    Tenant shall provide City copies of all documents related to such transaction so that City and/or its independent auditor can verify the amount payable to Tenant for the assignment and the amounts of all deductible expenses claimed by Tenant. The amount payable to Tenant shall include all cash and the reasonable value of all non-cash payments for such assignment.

Any valid transfer of Tenant's interest in this Agreement in accordance with this Agreement and applicable Law shall bind all heirs, distributees, executors, administrators, legal representatives, successors and assigns to all the Terms and conditions of this Agreement, whether obligations incurred pursuant to the Agreement arose before or after the assignment.

(b)    Right to Terminate. The Executive Director may terminate this Agreement if Tenant transfers or attempts to transfer any interest in this Agreement in violation of this Section, after first providing Tenant seven (7) calendar days' notice of default and opportunity to cure. Upon termination by City, City shall be entitled to all rentals which Tenant has collected and is owed by sublessees or assignments made contrary to this Agreement to the extent such rentals exceed the rent which City has charged Tenant for the Premises subleased or assigned.

(c)    Change of Ownership in Tenant; Affiliates.

(1)    If Tenant is a corporation, limited liability company, partnership, trust or other form of entity, then any transfer by one or more owners (referred to herein as "Owner") of such entity of a cumulative total of more than fifty percent (50%) of the ownership interests of Tenant (whether in one transaction or a series of transactions) during any twelve (12) month period shall be deemed to constitute an assignment of this Agreement requiring approval of Board as set forth in this Section 10; provided, however, that any transfer of an ownership interest of Tenant by an Owner who is an individual (including a trust or other entity for the benefit of such individual) to such individual's spouse, parent(s), sibling(s), children or grandchildren (or to a trust or other entity for the benefit of any of such persons) shall not be considered a transfer for purposes of determining whether a deemed assignment has occurred and shall not require approval by Board; and provided, further, that a transfer of ownership interest in Tenant by an Owner to another person or entity who/which is an Owner as of the effective date of this Agreement shall not be considered a transfer for purposes of determining whether a deemed assignment has occurred and shall not require approval by Board.

(2)    Notwithstanding the provisions of subsection (a)(2) of this Section 10, Tenant may, following written notice to City and the prior approval of Board, which

32

shall not unreasonably be delayed or withheld, assign this Agreement to an "Affiliated Entity," as defined herein, which assignment shall not, however, be subject to payment of the transfer fee required under subsection (a)(2) of this Section 10. An "Affiliated Entity" is any entity in which the present Owners of Tenant collectively own more than fifty percent (50%) of the ownership interests at the time of such assignment.

(3)    Board shall have the authority, but not the obligation, to modify the foregoing conditions based on the facts of a particular transfer, provided that such modifications shall not be more restrictive than the conditions set forth above.

(d)    <u>Assignments for Security Purposes.</u>  Board will consider assignments for security purposes if Tenant and its lenders satisfy the following conditions:

(1)    With respect to assignments for security purposes by the original Tenant under this Agreement, the amount of indebtedness secured by such assignment shall not exceed eighty percent (80%) of the fair market value of Tenant's total interest in the Tenant Improvements, in this Agreement and in the net operating income derived by Tenant from operations on the Premises. With respect to assignments for security purposes by any successor Tenant under this Agreement, the amount of indebtedness secured by such assignment shall not exceed eighty percent (80%) of the fair market value of Tenant's total interest in the Tenant Improvements, in this Agreement and in the net operating income derived by Tenant from operations on the Premises.

(2)    Monies borrowed are a fixed amount and may only be used for improvements on the Premises.  New borrowings or refinancings require further Board approval.

(3)    The collateral for the security agreement shall be only Tenant's interest in the Agreement and Tenant's Improvements on the Premises.

(4)    Nothing in the security documents shall alter, amend, modify, or otherwise affect the rights of City under this Agreement.

(5)    Lender will, by registered mail, deliver to Board a copy of any notice of Default sent to Tenant at the same time sent to Tenant.  Such notices shall be addressed to:

Board of Harbor Commissioners
c/o Director of Property Management
P.O. Box 151
San Pedro, CA  90733-0151

and shall specify which of the following actions the Lender will take:

(i)      Assume as principal all of the obligations and duties arising on or after the foreclosure conveyance date and hire an operator, reasonably acceptable to the Executive Director, to operate the Premises pursuant to the Agreement; or

(ii)     Cause a transferee reasonably acceptable to Board and approved by order of Board to assume as principal all of the obligations and duties arising on or after the foreclosure conveyance date.

The Board shall mail to Lender a copy of any notice of Default sent to Tenant, addressed as specified by Tenant in writing.  If Tenant fails to specify the address of Lender, notice to Tenant alone shall be sufficient.

The Lender shall cure the Default within the time specified in the notice, except that if the Default is noncurable, City shall have the right to immediately reclaim the Premises and Lender shall have no further interest.

(6)      Any proposal to transfer Lender's interest requires Board's consent. Board may withhold its consent unless the proposed transferee meets the following conditions:

(i)      This Agreement shall remain in full force and effect and Lender agrees in writing to cure any Defaults before the transfer.

(ii)     The financial condition of the proposed transferee is as sound as that of Tenant at the commencement of this Agreement or at the time of the proposed transfer - whichever provides the better financial security to Board; and that the proposed transfer will not unfavorably affect the revenues of the City, employment or the services available to the maritime community.

(7)      All instruments and documents related to the security transaction shall be reasonably acceptable to the Executive Director and City Attorney.

(e)      <u>Subleases.</u>  Tenant's right to sublease the Premises is conditioned upon compliance with the provisions of Section 5(a) of this Agreement and the prior written approval of the Board of Harbor Commissioners, which shall not unreasonably be withheld or delayed, and shall be allowed only if:

(1)      At the time of sublease, this Agreement is in effect and Tenant is not in Default. City's consent to a sublease shall not be deemed a waiver of Tenant's breach of any provision of the Agreement.

34

(2)    The proposed sublessee has sufficient experience and financial stability to operate a business of the type and quality contemplated in the sublease.

(3)    City has been provided a copy of the sublease and such other information as City requires.

(4)    In the event that such sublease concerns an unimproved portion of the Premises, the compensation for sublet Premises shall not exceed the compensation charged Tenant under this Agreement.

(f)    <u>Miscellaneous Conditions.</u>  Any consent given shall not be construed as consent to any other transfer, and the City's consent to a transfer shall not alter Tenant's obligation to comply with this Agreement.

Section 11.    <u>Miscellaneous.</u>

(a)    <u>Statements of Tenant.</u>  This Agreement is granted pursuant to an application Tenant filed with the Harbor Department.  If the application or its attachments contain a material misstatement of fact, Board may cancel this Agreement upon thirty (30) days' notice and Tenant shall quit and surrender the Premises upon expiration of such notice.

(b)    <u>Applicable Law.</u>  The Laws of the State of California govern all questions concerning this Agreement.

(c)    <u>Compliance with Laws.</u>  Tenant shall comply with all applicable Laws governing its use and occupancy of the Premises.  Tenant shall comply immediately with lawful directives issued by Executive Director or his authorized representative.

(d)    <u>Non-discrimination.</u>  Tenant agrees not to discriminate in its employment practices against any employee or applicant for employment because of the employee's or applicant's race, religion, national origin, ancestry, sex, age or physical handicap.  All assignments, subleases and transfers of interest in this Agreement under or pursuant to this Agreement shall contain this provision.

The provisions of Section 10.8.4 of the Los Angeles Administrative Code, as set forth in the attached Exhibit "E", are incorporated herein and made a part hereof.

(e)    <u>Minority Business Enterprise/Women Business Enterprise.</u>  Tenant is aware of the Los Angeles Harbor Department's Minority Business Enterprise/Women Business Enterprise (MBE/WBE) policy (hereinafter "Policy").  Tenant shall comply with the Harbor Department's Policy for the construction of any Improvements on the Premises.  Any construction contracts by Tenant shall include the Department's MBE/WBE Policy, attached as Exhibit "F," which is incorporated herein and made a part hereof.

35

Tenant acknowledges that Board reserves the right to amend or modify its Policy from time to time. Any such amendment or modification to the Policy shall be binding on Tenant from the date the Board approves such changes at a public meeting after notice and an opportunity to be heard thereon.

(f)    License Fees and Taxes. Tenant shall pay all taxes and assessments levied upon Tenant's interest, if any, created by this Agreement in the Premises or upon Tenant Improvements, or upon Tenant's operations. Tenant shall also pay all license and permit fees required for its operations.

TENANT IS AWARE THAT THE GRANTING OF THIS AGREEMENT TO TENANT MAY CREATE A POSSESSORY PROPERTY INTEREST IN TENANT AND THAT TENANT MAY BE SUBJECT TO PAYMENT OF A POSSESSORY PROPERTY TAX IF SUCH AN INTEREST IS CREATED.

(g)    Invalidity.    If any Term of this Agreement shall be held invalid or unenforceable to any extent by a final judgment of any court, the remainder of the Agreement shall not be affected and shall continue in full force and effect.

(h)    Attorney's Fees. In the event any suit is commenced to enforce, protect, or establish any right or remedy arising under this Agreement, each party shall bear its own attorney's fees and costs of suit.

(i)    Conflict of Interest. It is hereby understood and agreed that the parties to this Agreement have read and are aware of the provisions of Section 1090 et seq. and Section 87100 et seq. of the Government Code relating to conflict of interest of public officers and employees, as well as the Conflict of Interest Code of the Harbor Department. All parties hereto agree that they are unaware of any financial or economic interest of any public officer or employee of City relating to this Agreement. Notwithstanding any other provision of this Agreement, it is further understood and agreed that if such a financial interest does exist at the inception of this Agreement, City may immediately terminate this Agreement by giving written notice thereof.

(j)    Visitors.    Tenant shall allow Executive Director and his designated representatives reasonable access to the Premises for the purpose of showing the Premises and Improvements made by Tenant to visitors upon the giving of reasonable notice to Tenant.

(k)    Notices.    In all cases where written notice is to be given under this Agreement, service shall be deemed sufficient (unless otherwise provided in this Agreement) if notice is deposited in the United States mail, postage prepaid by registered or certified mail, return receipt requested. Such notice shall be effective from the date of its receipt. Unless otherwise provided by notice in writing from the respective parties, notice to City shall be addressed to Executive Director, Los Angeles Harbor Department,

36

P.O. Box 151, San Pedro, California 90733-0151 and notice to Tenant shall be addressed to it at the address set forth above.  Nothing herein contained shall preclude or render inoperative service of such notice in the manner provided by applicable Law.

(l)    Waivers.  No waiver by either party at any time of any Term of this Agreement shall be deemed or taken as a later waiver of any Term of this Agreement, nor of the strict and prompt performance thereof by the proper party.  The subsequent acceptance of rent by Board shall not be deemed to be a waiver of any other breach by Tenant of any Term, covenant or condition of this Agreement, other than the failure of Tenant to timely make the particular rent payment so accepted, regardless of Board's knowledge of such other breach.  No delay, failure or omission of either party to execute any right, power, remedy, privilege or option (collectively "Right") arising from any Default, nor subsequent acceptance of guarantee then or thereafter accrued, shall impair any such right, power, privilege, or option, or be construed to be a waiver of any such Default or acquiescence therein.  No notice by either party shall be required to restore or revive the time is of the essence provision hereof after waiver by the other party or Default in one or more instances.  No Right of either party shall be construed as being exhausted or discharged by the exercise thereof in one or more instances.  All of the Rights given to either party by this Agreement are cumulative.  No one Right shall be exclusive of the other or exclusive of any remedies provided by Law; the exercise of one Right by either party shall not impair its other Rights.

(m)    Integration.  This Agreement and its exhibits constitute the whole agreement between City and Tenant.  There are no Terms, obligations or conditions other than those contained herein.  No modifications of this Agreement shall be valid and effective unless evidenced by an agreement in writing.

(n)    Time of the Essence.  Time is expressly declared to be of the essence in this Agreement.

(o)    Extensions.  Board shall have the right to grant reasonable extensions of time to Tenant for any purpose or for the performance of any obligation of Tenant hereunder.

(p)    Authority.  If either party hereto is a corporation, limited liability corporation, trust or general or limited partnership, each individual executing this Agreement on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Agreement on its behalf.  If Tenant is a corporation, limited liability corporation, trust or partnership, Tenant shall, within thirty (30) days after request by City, deliver to City evidence satisfactory to City of such authority.

(q)    Quiet Possession.  So long as Tenant pays to City the compensation due under this Agreement and performs all other obligations set forth herein, Tenant's possession of the Premises will not be disturbed by City.

37

(r)    Prior Permits. This Agreement shall succeed Permit No. 313. From and after the effective date of this Agreement, said permit shall have no further force or effect except to the extent either party has accrued any rights or obligations under said permit.

(s)    Standard for Discretionary City Actions Not Related to Assignments, Subleases, or Changes in Use of Premises. The parties recognize that this Agreement allows the City, its Board of Harbor Commissioners, and Executive Director to make certain discretionary decisions during the permit term. Such decisions (with the exception of discretionary decisions related to assignments, subleases, or changes in the use of the premises which shall be made, if allowed, pursuant to the criteria set forth in sections of the Agreement dealing with those topics and pursuant to applicable law) will take into account the circumstances applicable when the decisions must be made, the Agreement terms, the present and prospective conditions at the premises (and other premises where relevant), the Port's development needs, and such other factors as City deems relevant.

(t)    Service Contract Worker Retention ("SCWR") and Living Wage Policy. Tenant is aware of and agrees to comply with Los Angeles Charter Section 378 which requires that a living wage be provided to employees of those doing business with the City and to comply with Los Angeles Administrative Code ("LAAC") Section 10.37 et seq. Tenant is also aware of the City's worker retention policy set forth in LAAC Section 10.36 et seq. A copy of the living wage and worker retention ordinances which are in the L.A. Administrative Code are available from the Harbor Department's Property Management Division. Violation of these provisions, where applicable, shall entitle the City to terminate this contract and otherwise pursue legal remedies that may be available.

The Ordinances require that, unless specific exemptions apply, all employers (as defined) under contracts primarily for the furnishing of services to or for the City and that involve an expenditure or receipt in excess of $25,000 and a contract term of at least three months or certain recipients of City financial assistance, generally shall provide the following:

(1)    Retention by a successor contractor for a 90-day transition period, the employees who have been employed for the preceding 12 months or more by the terminated contractor or subcontractor, if any, earning less than $15 per hour in salary or wage, as provided for in the SCWR ordinance.

(2)    Payment of a minimum initial wage rate to employees as defined in the Declaration of Compliance, attached to this Agreement as Exhibit "G". Such rates shall be adjusted annually in a manner described in the ordinance and shall be published by the City of Los Angeles. The adjusted rates shall take effect upon such publication.

38

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date to the left of their signatures.

THE CITY OF LOS ANGELES, by its
Board of Harbor Commissioners

Dated 6-19-03

By _____
Executive Director

Attest _____
Board Secretary

COLONIAL YACHT ANCHORAGE, INC.

Dated 6-28-00 2

By _____
AGOSTINO CAMELLO Owner
(Print/Type Name and Title)

Attest _____
MARIA CAMELLO ASST. V.P.
(Print/Type Name and Title)

APPROVED AS TO FORM

Sept 19 , 2003
JAMES K. HAHN, City Attorney

By _____
RAYMOND P. BENDER, Assistant

RPB:cp
12/28/2000

40

(u)    <u>Business Tax Registration Certificate.</u> Tenant represents that it has obtained and presently holds the Business Tax Registration Certificate(s) required by the City's Business Tax Ordinance (Article 1, Chapter 2, Sections 21.00 and following of the Los Angeles Municipal Code). The Tenant will provide the Director of Property Management evidence that said Certificate has been obtained. The Tenant shall maintain, or obtain as necessary, all such Certificates required of it under said Ordinance and shall not allow any such Certificate to be revoked or suspended.

/ / / /

/ / / /

/ / / /

/ / / /

39

Attorney or Party Name, Address, Telephone & FAX Numbers, and California State Bar Number

Paul M. Brent #125976
Steinberg Nutter & Brent, Law Corp.
23801 Calabasas Rd. #2031
Calabasas, CA 91302
818 876 8535 (t)
818 876 8536 (f)

*Attorney for Plaintiff* Colonial Yacht Anchorage, Inc

FOR COURT USE ONLY

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

In re: Colonial Yacht Anchorage, Inc

Debtor.

CHAPTER  11

CASE NUMBER  2:11-bk-46267 RN

ADVERSARY NUMBER

Colonial Yacht Anchorage, Inc.

Plaintiff(s),

vs.

City of Los Angeles

Defendant(s).

*(The Boxes and Blank Lines below are for the Court's Use Only) (Do Not Fill Them In)*

**SUMMONS AND NOTICE OF**
**STATUS CONFERENCE**

TO THE DEFENDANT: A Complaint has been filed by the Plaintiff against you. If you wish to defend yourself, you must file with the Court a written pleading, in duplicate, in response to the Complaint. You must also send a copy of your written response to the party shown in the upper left-hand corner of this page. Unless you have filed in duplicate and served a responsive pleading by _____, the Court may enter a judgment by default against you for the relief demanded in the Complaint.

A Status Conference on the proceeding commenced by the Complaint has been set for:

| Hearing Date: | Time: | Courtroom: | Floor: |
|---|---|---|---|

❑  **255 East Temple Street, Los Angeles**          ❑  **411 West Fourth Street, Santa Ana**

❑  **21041 Burbank Boulevard, Woodland Hills**      ❑  **1415 State Street, Santa Barbara**

❑  **3420 Twelfth Street, Riverside**

PLEASE TAKE NOTICE that if the trial of the proceeding is anticipated to take less than two (2) hours, the parties may stipulate to conduct the trial of the case on the date specified, instead of holding a Status Conference. Such a stipulation must be lodged with the Court at least two (2) Court days before the date set forth above and is subject to Court approval. The Court may continue the trial to another date if necessary to accommodate the anticipated length of the trial.

Date of Issuance: _____

**KATHLEEN J. CAMPBELL**
Clerk of Court

By: _____
*Deputy Clerk*

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*February 2010 (COA-SA)*                                                              **F 7004-1**

Summons and Notice of Status Conference  - *Page 2*                    **F 7004-1**

| | |
|---|---|
| In re<br>Colonial Yacht Anchorage, Inc          (SHORT TITLE)<br>Debtor(s). | CASE NO.: 2:11-bk-46267 RN |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on a CM/ECF docket.

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

A true and correct copy of the foregoing document described as _____
_____ will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d), and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On _____ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email addressed indicated below:

☐ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served): On _____ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follow.  Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method) by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| *Date* | *Type Name* | *Signature* |
|---|---|---|

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*February 2010 (COA-SA)*                                                    **F 7004-1**

FORM B104 (08/07)                                                                    2007 USBC, Central District of California

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Page 2) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

**PLAINTIFFS**
Colonial Yacht Anchorage, inc

**DEFENDANTS**
City of Los Angeles

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
P. M. Brent
Steinberg Nutter & Brent, Law Corp 23801 Calabasas Rd. #2031
Calabasas, CA 91302

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
☒ Debtor      ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor    ☐ Other
☐ Trustee

**PARTY** (Check One Box Only)
☐ Debtor      ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor    ☐ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Declaratory Relief / Breach of Contract

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property – §542 turnover of property
☐ 12-Recovery of money/property – §547 preference
☐ 13-Recovery of money/property – §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability – §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability – §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability – §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought
Declaratory Relief and Money Damages

FORM B104 (08/07), page 2                                                        2007 USBC, Central District of California

## BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES

| NAME OF DEBTOR | | BANKRUPTCY CASE NO. |
|---|---|---|
| Colonial Yacht Anchorage, Inc | | 2:11-bk-46267RN |

| DISTRICT IN WHICH CASE IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
|---|---|---|
| Central | Downtown | Neiter |

### RELATED ADVERSARY PROCEEDING (IF ANY)

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| | | |

| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
|---|---|---|
| | | |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) |
|---|
| |

| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) |
|---|---|
| 9/19/11 | P. M. Brent |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. if such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.